PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                              No. 00-4253

GARY DUANE GODWIN,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Frank W. Bullock Jr., District Judge.
(CR-99-253)

Argued: April 3, 2001

Decided: June 14, 2001

Before TRAXLER and GREGORY, Circuit Judges, and
Lacy H. THORNBURG, United States District Judge for the
Western District of North Carolina, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Traxler wrote the
opinion, in which Judge Gregory and Judge Thornburg joined.

_____

## COUNSEL

**ARGUED:** David Bernard Smith, Greensboro, North Carolina, for
Appellant. Michael Francis Joseph, Assistant United States Attorney,
Greensboro, North Carolina, for Appellee. **ON BRIEF:** Walter C.
Holton, Jr., United States Attorney, Greensboro, North Carolina, for
Appellee.

**OPINION**

TRAXLER, Circuit Judge:

Gary Duane Godwin appeals the sentence imposed after he pleaded guilty to a charge of harboring a fugitive. *See* 18 U.S.C.A. § 1071 (West 2000). We vacate Godwin's sentence and remand for resentencing.

I.

In February 1999, Durham police officers and federal agents visited Godwin's house in search of Harry Arliss Jordan, a fugitive with an outstanding arrest warrant for unlawful possession of a firearm. *See* 18 U.S.C.A. § 922(g)(1) (West 2000). They informed Godwin about the outstanding arrest warrant and told Godwin that he should contact them if he saw Jordan. A few weeks later the officers and agents returned to Godwin's house. Although Godwin denied that Jordan was present, he consented to a search of the house, and Jordan was discovered in a bedroom.

Godwin pleaded guilty, and his sentencing proceeding took place after Jordan was sentenced on his felon-in-possession charge. Pursuant to section 2X3.1(a) of the *United States Sentencing Guidelines Manual*, the district court determined that Godwin's base offense level was eighteen, reduced the offense level by three levels to reflect Godwin's acceptance of responsibility, and sentenced Godwin to eighteen months imprisonment, followed by three years of supervised release.

II.

The version of the Sentencing Guidelines in effect at the time of Godwin's sentencing directs sentencing courts to use the guideline "most applicable to the offense of conviction," U.S.S.G. § 1B1.2 comment. (n.1) (1998), and provides a statutory index of crimes and applicable guidelines to assist in that determination, *see id.*; U.S.S.G. App. A. For cases involving the harboring of a fugitive, the index refers the sentencing court to U.S.S.G. § 2X3.1, the accessory-after-the-fact guideline.

Section 2X3.1 states that the base offense level is "6 levels lower than the offense level for the underlying offense, but in no event less than 4, or more than 30. *Provided*, that where the conduct is limited to harboring a fugitive, the offense level shall not be more than level 20." U.S.S.G. § 2X3.1(a). The application notes define "underlying offense" as "the offense as to which the defendant is convicted of being an accessory" and explain that the court should apply "the base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant." U.S.S.G. § 2X3.1, comment. (n.1).

The "underlying offense" in this case is the unlawful possession of a weapon by Jordan, the fugitive whom Godwin harbored. The Sentencing Guidelines establish a base offense level of fourteen for a basic charge of possession of a firearm by a prohibited person. *See* U.S.S.G. § 2K2.1(a)(6). However, the offense level increases if the firearm involved is of a specified type or if the defendant has prior felony convictions for crimes of violence or controlled substance offenses. *See* U.S.S.G. §§ 2K2.1(a)(1) - (5). Jordan had multiple prior felony convictions for crimes of violence and controlled substance offenses. Because of these prior convictions, Jordan was assigned a base offense level of twenty-four on his felon-in-possession charge. *See* U.S.S.G. § 2K2.1(a)(2) (providing for a base offense level of twenty-four "if the defendant had at least two prior felony convictions of either a crime of violence or a controlled substance offense"). When Godwin was sentenced on the harboring charge, the district court took Jordan's base offense level of twenty-four and reduced it by six levels, yielding a base offense level of eighteen for Godwin.

On appeal, Godwin argues that section 2X3.1 requires the use of the general base offense level for the offense for which Jordan was convicted, and not the offense level actually assigned to Jordan, which in this case reflected Jordan's criminal history. Godwin contends that the offense for which Jordan was convicted was a straightforward possession-by-a-prohibited-person charge under 18 U.S.C.A. § 922(g). Thus, Godwin argues that the starting point for his base offense level calculation should have been fourteen, not twenty-four. "Because resolution of this issue turns primarily upon the legal interpretation of the Sentencing Guidelines, our standard of review is *de*

*novo*." *United States v. Kinter*, 235 F.3d 192, 195 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 1393 (2001).

### III.

Section 2X3.1 of the guidelines hinges the punishment for those who harbor fugitives on the severity of the offense committed by the criminal whom they harbored by using the base offense level for the fugitive's offense as the starting point for calculating the harborer's offense level. Using the base offense level for the fugitive's crime as the starting point reflects a rational determination that the harboring of a murderer, for example, presents a greater danger to society than does the harboring of a tax evader and should be punished more severely. And while harboring a fugitive with an extensive criminal record might also present a greater danger than harboring a fugitive with no criminal record, the language of section 2X3.1 does not take into account the criminal record of the fugitive. Section 2X3.1 simply sets the harboring base offense level six levels lower than "the offense level for the underlying offense"; it makes no mention of the offense level that in fact was or would be assigned to the fugitive.

In most cases, the offense level for the underlying crime will be the same as the offense level actually assigned to the fugitive. That is because the majority of the offense guidelines set a base offense level that in no way takes into account the defendant's criminal record.[1] As noted above, however, section 2K2.1 establishes a range of base offense levels, many of which are dependent on the criminal record of the firearm possessor. If the base offense level actually assigned to the fugitive under section 2K2.1 is used as the starting point when determining the harborer's base offense level, as was done in this case, then the harborer's punishment is effectively enhanced by virtue of the fugitive's criminal history. In our view, such a result is inconsistent with the plain language of section 2X3.1, which requires that

---

[1]Besides section 2K2.1, it appears that the only other guideline that increases the base offense level by virtue of the defendant's criminal history is section 2K1.3, which applies to crimes involving the receipt, possession, or transportation of explosive materials. *See* U.S.S.G. § 2K1.3(a).

the district court start with the base offense level for the underlying offense, not the base offense level ultimately assigned to the fugitive.[2]

In reaching this conclusion, we are persuaded by the Sixth Circuit's analysis in *United States v. Hendrick*, 177 F.3d 547 (6th Cir. 1999). At issue in *Hendrick* was the application of U.S.S.G. § 2X2.1, the guideline for aiding and abetting. The aiding-and-abetting guideline provides that the base offense level for the aider-and-abettor is the "same level as that for the underlying offense," U.S.S.G. § 2X2.1, and defines "underlying offense" as "the offense the defendant is convicted of aiding or abetting," *id.* comment. (n.1). The crime that the *Hendrick* defendant aided and abetted was a violation of 18 U.S.C.A. § 922(g). And as in this case, the principal offender in *Hendrick* had prior qualifying felony convictions, which, pursuant to U.S.S.G. § 2K2.1(a)(2), resulted in a base offense level of twenty-four for the principal offender. *See Hendrick*, 177 F.3d at 549. The district court interpreted the guidelines as requiring that the aider-and-abettor receive the same offense level as the principal offender and therefore assigned a base offense level of twenty-four to the defendant. The Sixth Circuit reversed.

The court explained that the underlying offense that the defendant

> aided and abetted was the violation of 18 U.S.C.A. § 922(g) —illegal possession of a firearm by a convicted felon. That statute applies to any person "who has been convicted in any court of a crime punishable by imprisonment of a term exceeding one year." The statute itself makes no distinction between a defendant with numerous felony convictions and a defendant with only a single felony conviction. Rather, a defendant's record becomes relevant only at the sentencing phase. . . .

---

[2]Because we agree with Godwin that the district court improperly applied the Sentencing Guidelines, we do not consider Godwin's primary argument that sentencing one defendant based on the criminal history of another amounts to an equal protection violation. *See, e.g.*, *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").

> . . . Nothing in either U.S.S.G. § 2X2.1 or its commentary suggests that the defendant's base offense level must be the same as the principal's base offense level. In fact, the sentencing guideline makes no reference to the principal offender at all—only to the underlying offense. This Court sees a clear distinction between basing an individual's offense level on the underlying offense and basing it on the offense level applied to the principal offender.
>
> . . .
>
> The sentencing guideline for aiding and abetting states that the defendant's offense level "is the same level as that for *the underlying offense*." The guideline does not say that the defendant's offense level is the same level as that for *the principal offender*.

*Id.* at 550-51 (citations omitted).

While *Hendrick* involved application of the aider-and-abettor guideline, we believe its analysis is equally applicable to the accessory-after-the-fact guideline, given that sentencing under both guidelines is dependent on the base offense level for the "underlying offense," which is defined similarly in both guidelines. Like the guideline at issue in *Hendrick*, section 2X3.1 speaks in generic terms of the underlying offense. If the Sentencing Commission intended that the base offense level assigned to the fugitive should be used as the starting point when determining the harborer's offense level, that would have been an easy enough task to accomplish by simply referring to the offense level of the fugitive rather than the offense level of the underlying offense. But because section 2X3.1 refers only to the base offense level for the underlying offense, we do not believe it is proper to use the base offense level assigned to the fugitive by virtue of the fugitive's criminal history when determining the base offense level for the defendant who harbors the fugitive.

The underlying offense here is a violation of 18 U.S.C.A. § 922(g), which proscribes the possession of a firearm by a prohibited person. The section 922(g) offense takes into consideration the criminal history of the offender only to the extent that the criminal history renders

the offender a prohibited person; the statute is otherwise unconcerned with the criminal history of the offender. Whether the section 922(g) violator has one prior felony conviction or ten, the crime he commits is the same: possession of a firearm by a prohibited person, an offense for which the guidelines establish a base offense level of fourteen. *See* U.S.S.G. § 2K2.1(a)(6). It is only when the section 922(g) violator is sentenced that the rest of his history becomes relevant and potentially exposes him to a higher base offense level under the guidelines or a mandatory minimum sentence under 18 U.S.C.A. § 924(e) (West 2000). But the fact that some section 922(g) violators may receive higher base offense levels by virtue of their criminal records under the guidelines does not change the conclusion that, for purposes of applying the accessory-after-the-fact guideline, the base offense level for a violation of section 922(g) ordinarily is fourteen.

This is not to say, however, that the base offense level will always be fourteen when a section 922(g) violation is the "underlying offense." Section 2K2.1 of the guidelines provides for enhanced offense levels if the firearm involved was one of the more dangerous weapons described in 26 U.S.C.A. § 5845(a) or 18 U.S.C.A. § 921(a)(30). *See* U.S.S.G. §§ 2K2.1(a)(4)(B) & (a)(5).[3] In addition, the commentary to section 2X3.1 specifically provides that the base offense level for an accessory-after-the-fact should reflect "any applicable specific offense characteristics [of the underlying offense] that were known, or reasonably should have been known, by the defendant." U.S.S.G. § 2X3.1 comment. (n.1).

Unlike the enhancements based on the criminal history of the section 922(g) violator, however, these offense level enhancements involve the actual conduct of the offender in the context of the charged offense, which is used throughout the Sentencing Guidelines to determine the offense level. *See, e.g.*, *United States v. Petty*, 132

---

[3]While subsections 2K2.1(a)(1) and (a)(3) likewise establish enhanced offense levels based on the type of weapon involved, enhancement under these subsections is also dependent on the defendant's criminal history beyond his status as a prohibited person. For the reasons discussed above, these enhancements would not be applicable when determining the base offense level of one treated as an accessory-after-the-fact under section 2X3.1.

F.3d 373, 381 (7th Cir. 1997) ("The Sentencing Commission decided in the formative stages of the Guidelines to design a system that does contain a significant number of real offense elements, meaning that the sentencing court examines the entirety of events surrounding the offense and not merely the facts alleged and proved at trial." (citation and internal quotation marks omitted)); *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992) ("Ordinarily the Guidelines permit a district court to look to the actual conduct underlying a conviction."). Using these enhancements to determine the base offense level for the underlying offense is perfectly consistent with the language of guideline 2X3.1 and is likewise consistent with the policy underlying that guideline: to punish more severely those who act as accessories-after-the-fact to more serious crimes. Thus, if a defendant harbors a section 922(g) fugitive who would be subject to an offense level enhancement because of the type of weapon involved, then the harborer's offense level would likewise reflect the enhancement for the more dangerous weapon, whether or not the harborer knew the nature of the weapon involved in the section 922(g) violation. *Cf. United States v. Girardi*, 62 F.3d 943, 945-46 (7th Cir. 1995) (explaining that because the quantity of drugs is relevant to the determination of the initial base offense level for drug-related offenses under U.S.S.G. § 2D1(a)(3), the quantity-derived base offense level is the starting point under U.S.S.G. § 2X3.1 when calculating the offense level for a defendant convicted as an accessory-after-the-fact to the drug offense, even if the defendant did not know the quantity of drugs involved); *see also United States v. Glover*, 52 F.3d 283, 286-87 (10th Cir. 1995); *United States v. Stephens*, 906 F.2d 251, 253-54 (6th Cir. 1990). And the harborer's base offense level would also be increased to reflect any specific offense characteristics of the underlying offense of which the harborer knew or reasonably should have known.

Thus, if any of the base offense level enhancements that reflect the actual conduct surrounding the underlying offense are applicable, then the greatest of those offense levels should be used as the base offense level for the underlying offense when applying section 2X3.1 of the guidelines. Nothing in the record, however, demonstrates that any of the these enhancements are appropriate in this case, and we are

therefore left with a base offense level of fourteen for the underlying 18 U.S.C.A. § 922(g) violation. *See* U.S.S.G. § 2K2.1(a)(6).[4]

IV.

To summarize, we conclude that if the underlying offense for purposes of applying the accessory-after-the-fact guideline is a violation of 18 U.S.C.A. § 922(g), the base offense level for the underlying offense should not be enhanced based on the criminal record of the 922(g) offender. Accordingly, the base offense level for an underlying section 922(g) violation will be fourteen, unless an offense level enhancement under U.S.S.G. §§ 2K2.1(a)(4)(B) or 2K2.1(a)(5) is warranted.

In this case, the district court erred by using a base level of twenty-four for the underlying offense. Using fourteen as the base offense level for Jordan's underlying section 922(g) violation and reducing that by six levels, as required by U.S.S.G. § 2X3.1, yields a base offense level of eight. With the three-level acceptance-of-responsibility adjustment and considering Godwin's category I criminal history, the guidelines establish that the appropriate sentencing range for Godwin is zero to six months, instead of the eighteen-to-twenty-four-month range used by the district court. We therefore vacate Godwin's sentence and remand for resentencing in accordance with this opinion.

*VACATED AND REMANDED*

---

[4]The government suggested at oral argument that this interpretation will eviscerate section 2K2.1 of the guidelines by eliminating from consideration half of the base offense levels established by that section. Our opinion, however, is hardly so far-reaching, given that it quite obviously has no effect on the application of section 2K2.1 to those convicted of violating 18 U.S.C.A. § 922 or other relevant statutes. All of the many base offense levels established by the guideline remain viable when sentencing the firearm offender.