*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0296P (6th Cir.)
File Name: 01a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

            *v.*

KHALID HASSAN SHABAZZ,
      *Defendant-Appellant.*

No. 99-2388

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-80473—Lawrence P. Zatkoff, Chief District Judge.

Argued: March 7, 2001

Decided and Filed: August 30, 2001

Before: KRUPANSKY, BOGGS, and BATCHELDER,
Circuit Judges.

---

**COUNSEL**

**ARGUED:** Joan E. Morgan, Troy, Michigan, for Appellant.
Walter I. Kozar, ASSISTANT UNITED STATES
ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:**
Joan E. Morgan, Troy, Michigan, for Appellant. Walter I.
Kozar, ASSISTANT UNITED STATES ATTORNEY,
Detroit, Michigan, for Appellee.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.   Defendant Khalid Hassan Shabazz appeals from the sentence entered by the district court on his plea of guilty to obstruction of justice. Shabazz contends that the court erred in its calculation of his base offense level under the obstruction of justice guideline because, rather than making factual findings regarding his knowledge of the aggravating sentencing factors of the underlying offense, the district court based its calculation of his base offense level on the total offense level of the underlying offense obstructed.  For the reasons that follow, we vacate Shabazz's sentence and remand for resentencing.

## I.  Factual Background

In early 1998 an approximately three-month-long jury trial commenced in the prosecution of five defendants on charges of conspiracy under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), stemming from their involvement in the Detroit Cosa Nostra organization. Numerous appeals to this court followed the convictions obtained in that case and the related prosecution of a sixth co-conspirator.  *See, e.g.*, *United States v. Corrado*, Nos. 98-2394, 99-1001, 2000 WL 1290343 (6th Cir. Sept. 8, 2000); *United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000); *United States v. Corrado*, 227 F.3d 528 (6th Cir. 2000); *United States v. Tocco*, 209 F.3d 935 (6th Cir. 2000); *United States v. Tocco*, 200 F.3d 401 (6th Cir. 2000).  One of the defendants in the RICO prosecution was Paul Corrado, whose most serious offense of conviction involved conspiracy to commit murder.

Khalid Hassan Shabazz, also known as Dwayne Ronald Harris, Dwayne Walter Lee, or "Dee," approached Corrado, an acquaintance, during a break in Corrado's trial two days before the scheduled delivery of closing arguments.  Shabazz handed Corrado a lottery ticket with a pager number and the

name "Dee" written on it and informed Corrado that he had two people in position to hang the jury and that Corrado should page him if interested. Corrado immediately told his attorney of this proposal; with Corrado's consent, the attorney contacted the Federal Bureau of Investigation ("FBI"). Corrado agreed to cooperate with an investigation into the matter.

The next day Corrado paged Shabazz, and the FBI recorded the ensuing telephone calls in which Shabazz told Corrado that a friend of his was on the jury, believed the defendants were not guilty, and would fight for acquittal. Additionally, Shabazz reported that his juror friend thought he could persuade two or three others to join him. Corrado inquired what payment Shabazz's friend required, to which Shabazz replied that he had been instructed to ask only for whatever he thought was fair. With closing arguments fast approaching, Corrado asked Shabazz to talk to his friend on the jury that day so that he could make arrangements to deliver the money. Eventually, Shabazz agreed to meet Corrado at a restaurant in downtown Detroit that night to discuss the matter further and indicated that he would meet with his friend on the jury beforehand. Corrado and Shabazz met as planned, and as Shabazz left the FBI arrested him.

In a post-arrest interview, FBI agents determined the identity of Shabazz's friend on the jury and learned that Shabazz had offered him $25,000 in exchange for his vote. When FBI agents contacted the juror, he informed them that Shabazz had approached him two days prior to closing arguments and asked him to tamper with the jury. Subsequently, the juror said, he avoided Shabazz altogether. As it happened, the juror proved to be an alternate who took no part in deliberations. A federal grand jury returned a single-count indictment charging Shabazz with obstructing justice in violation of 18 U.S.C. § 1503 by attempting to influence the jury in the prosecution of Paul Corrado.

In November 1998 Shabazz executed a plea agreement with the government. In exchange for his guilty plea, the United

States agreed not to take a position on which guidelines or sentencing factors apply, on whether Shabazz qualified for an offense-level reduction for acceptance of responsibility, or on the correct methodology for calculating the appropriate guideline range. In essence, because of the difficulties in calculating a sentence in this case, the parties agreed that a probation officer would recommend the appropriate guideline range, which the government would not oppose, but Shabazz could challenge the judge's ultimate determination on appeal.

## II. Sentencing Proceedings

During plea negotiations with the government, Paul Daniel Curtis represented Shabazz. Effective December 22, 1998, the Michigan Bar suspended Curtis for forty days for neglect of an unrelated criminal appeal in state court and failure to refund the unearned portion of his retainer in that representation. The Michigan Attorney Discipline Board's investigatory report of the incident giving rise to the discipline notes that Curtis had been reprimanded and admonished several times during the period in which he represented Shabazz in plea negotiations. Notwithstanding his suspension, Curtis represented Shabazz at his first sentencing hearing in early 1999.[1]

Shortly before the sentencing hearing, the probation officer completed the presentence investigation report ("PSR"), which calculated a guideline range of seventy to eighty-seven months' imprisonment based on a total offense level of 25 and a criminal history category of III. The PSR figured Shabazz's total offense level of 25 by applying U.S.S.G. § 2X3.1, which provides that an offense involving the

---

[1] Under Local Rule 83.22(e)(1)(A) of the Local Rules of the United States District Court for the Eastern District of Michigan, "[w]hen another jurisdiction enters an order of discipline against an attorney admitted to practice in this court, the same discipline is automatically effective in this court without further action by the court." Therefore, upon suspension by the Michigan Bar, Curtis was suspended from practice before the district court.

---

We think that the state of the record with respect to Shabazz's ineffective assistance of counsel claim requires adherence to our general rule that a defendant best pursues such a claim through a collateral proceeding. Fundamentally, the record simply leaves so much regarding the circumstances of Curtis's suspension and representation unstated as to preclude meaningful consideration of the issue. For example, Shabazz repeatedly references an initial offer of a plea, which Curtis advised him to reject, that specified a guideline range of forty-one to fifty-one months imprisonment. No mention of such an offer or its rejection appears in the record. Also, the record shows that Curtis had been reprimanded and admonished several times during his representation of Shabazz during plea negotiations, but fails to indicate the basis for discipline in those cases or whether investigation of them compromised his representation of Shabazz. Because of the inadequacy of the record, we decline to review Shabazz's ineffective assistance of counsel claim on direct appeal.

## VI. CONCLUSION

For the foregoing reasons, we vacate the sentence imposed by the district court and remand for resentencing upon a determination of Shabazz's proper offense level. We dismiss for lack of jurisdiction the appeal from the denial of Shabazz's motion for a downward departure and decline to address the ineffective assistance of counsel claim in this direct appeal.

such a claim to this court on direct appeal and the necessity that a successful claim show prejudice under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997). For these reasons, we have held that a defendant best pursues a claim of ineffective assistance through a post-conviction proceeding brought under 28 U.S.C. § 2255. *United States v. Long*, 190 F.3d 471, 478 (6th Cir. 1999). If the record is adequate to permit review of counsel's performance, however, we will consider the issue even if not raised before the district court. *United States v. Goodlett*, 3 F.3d 976, 980 (6th Cir. 1993).

Shabazz argues that Curtis's representation during a period in which he was suspended from the practice of law, which occurred at a stage of the proceedings at which the Sixth Amendment right to the effective assistance of counsel had already attached, constitutes a per se constitutional violation. This argument raises an issue of first impression in this circuit, and the circuits have split on the desirability of adopting per se rules regarding the ineffective assistance of counsel in such circumstances. *Compare, e.g., United States v. Maria-Martinez*, 143 F.3d 914 (5th Cir. 1998) (declining to adopt per se rules relating to deficiencies in an attorney's bar membership); *Vance v. Lehman*, 64 F.3d 119 (3d Cir. 1995); *United States v. Stevens*, 978 F.2d 565 (10th Cir. 1992); *United States v. Williams*, 934 F.2d 847 (7th Cir. 1991); *United States v. Mouzin*, 785 F.2d 682 (9th Cir. 1986) *with, e.g., United States v. Novak*, 903 F.2d 883 (2d Cir. 1990) (holding that representation by a person who fraudulently obtained a law license constituted a per se violation of the right to counsel); *Solina v. United States*, 709 F.2d 160 (2d Cir. 1983) (observing that individual who twice failed to pass the New York bar exam provided ineffective assistance of counsel per se); *Harrison v. United States*, 387 F.2d 203 (D.C. Cir. 1967) (determining that representation by an ex-convict who posed as a lawyer, but never attended law school, violated the Sixth Amendment per se).

obstruction of a criminal investigation or prosecution takes an offense level 6 levels lower than that of the underlying offense obstructed. The PSR then, erroneously, used a total offense level of 34 for Corrado,[2] reduced by an additional 3 levels for acceptance of responsibility. Further, the PSR assigned 2 criminal history points to Shabazz for a 1993 misdemeanor conviction for possession of marijuana and operating a vehicle in violation of license restrictions. Because at the time of the instant offense, Shabazz was on probation for the traffic offense, he received an additional 2 criminal history points, placing him at the bottom of criminal history category III.

Curtis filed objections to the PSR and urged the court to depart downward from the recommended guideline sentencing range as being excessive for the gravity of the offense. At the sentencing hearing, the suspended Curtis pressed these arguments before the district court, which overruled the objections and imposed a sentence of seventy months' imprisonment. With respect to the request for a downward departure, the sentencing judge stated, "I also read the defense's [objections] as a motion for a downward departure indicating that this is a matter that was not taken into consideration by the sentencing commission in adopting the guidelines. I do not believe that to be the case."

When Shabazz learned that his attorney had failed to file a notice of appeal and had appeared at sentencing while suspended from the practice of law, he obtained new appointed counsel and successfully sought enlargement of the time within which to file an appeal. The district court granted the motion of Shabazz's new attorney to enlarge the record on appeal to include the PSR prepared for Corrado's sentencing. Corrado's PSR calculated a total offense level of 33, which included adjustments of his base offense level upward to reflect (1) specific offense characteristics, (2) Corrado's role in certain offenses, and (3) multiple count adjustments.

---

[2] Corrado's total offense level was really 33.

Recognizing that the district court had based Shabazz's sentence on the belief that Corrado's total offense level was 34, the government confessed error, and we vacated the sentence and remanded.

During resentencing proceedings, Shabazz raised two issues before the district court in addition to the use of the improper base offense level. First, he argued that calculation of his base offense level should begin with the base offense level of the underlying offense obstructed and that using instead the total offense level of 33 for Corrado's underlying offense overstated Shabazz's offense level because it incorporated multiple-count adjustments and because Shabazz lacked any knowledge of or involvement with the RICO violations that were involved in reaching Corrado's total offense level. Second, Shabazz pointed to the severity of the guideline range, the overstatement of his criminal history, the fact that he attempted to influence only an alternate juror, and ambiguities about proper application of the guidelines in his case to support his request for a downward departure.

A revised PSR concluded that Shabazz's total offense level was 24 based on Corrado's total offense level of 33, less 6 levels pursuant to U.S.S.G. § 2X3.1 and less an additional 3 levels for acceptance of responsibility. With a criminal history in category III, then, the proper guideline range was sixty-three to seventy-eight months' imprisonment.

In an opinion and order issued on November 23, 1999, the district court addressed Shabazz's arguments regarding the proper offense level to use in calculating his guideline range. Relying on *United States v. Miller*, 161 F.3d 977 (6th Cir. 1998), the court reasoned that Shabazz had pleaded guilty to obstruction of justice for being an accessory after the fact on all counts on which Corrado had been convicted. Therefore, because he had obstructed the entire prosecution, not just the prosecution of Corrado's offense having the highest base offense level, the court overruled Shabazz's objection to using Corrado's offense level of 33 to calculate his offense level. The court also rejected Shabazz's additional objections

sentencing discretion. The Second Circuit has disposed of similar arguments with dispatch:

> Nothing is more common at a sentencing hearing in the age of the Sentencing Guidelines than a judge's statement that he is imposing a sentence within a particular range because that is the range prescribed by law—that is, a sentence in the range required by the application of the Guidelines. As any informed person is aware, the Guidelines have divested district judges of much, though not all, of the sentencing discretion that they once exercised. Accordingly, we should not be surprised when, on occasion, a district judge refers in the course of a sentencing hearing to the fact that the prescribed sentence range requires him to impose a sentence different from one he would impose in the absence of the Guidelines. We will not find, on the basis of such comments—or on the basis of expressions of frustrations with a sentence range prescribed by the Guidelines, such as "my hands are tied by the Guidelines" or "if it were up to me . . ." or "if it were not for the Guidelines, I would . . ." or some such comment—that a district judge is unaware of the scope of his authority under the regnant sentencing system.

*United States v. Brown*, 98 F.3d 690, 693-94 (2d Cir. 1996). We agree with the Second Circuit and find Shabazz's argument without merit. Also, Shabazz cites several cases in which district courts granted motions for downward departures when the guidelines overstated a defendant's criminal history. Those cases, however, establish neither an entitlement to a departure nor the district court's failure to recognize its authority to depart on such a basis in this case. We lack jurisdiction to consider the matter further.

## V. Ineffective Assistance of Counsel

Ordinarily, we do not review claims of ineffective assistance of counsel on direct appeal. *United States v. Jackson*, 181 F.3d 740, 747 (6th Cir. 1999). This rule stems from the lack of a sufficient record that typically accompanies

## IV. Denial of the Motion for a Downward Departure

We generally lack jurisdiction to review the discretionary decision of a district court not to grant a downward departure. *United States v. Landers*, 39 F.3d 643, 649 (6th Cir. 1994). We may review the denial of a defendant's motion for a downward departure only if the district court "incorrectly believed it lacked the authority to grant such a departure as a matter of law." *United States v. Owusu*, 199 F.3d 329, 349 (6th Cir. 2000). A sentencing judge has no duty to state affirmatively that he knows that he has the authority to grant such a departure, but declines to do so. *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). Moreover, we are reluctant to treat as ambiguous the statement of a judge at sentencing that omits an affirmative statement of his authority to depart downward. *United States v. Farrow*, 198 F.3d 179, 199 (6th Cir. 1999). Accordingly, we presume that district court judges are aware of their discretion to depart downward under the sentencing guidelines. *Id.*

Although the sentencing judge did not make an affirmative statement that he knew he possessed the power to depart downward, the record in this case reinforces the presumption that the district court knew of its authority to grant Shabazz's motion for a downward departure. At the first sentencing hearing, the judge expressed his view that the guidelines properly took account of the peculiarities of this case and declined to grant the motion. On remand, the judge again entertained the motion at oral argument before declining to depart. Unless Shabazz would have us believe that the district court heard arguments on a motion it thought it lacked the legal authority to grant, only an affirmative statement could more directly reflect the district court's knowledge of its discretion to depart.

Shabazz points to the statement at resentencing that the judge occasionally disagreed with the results of the guidelines to argue that he failed to recognize his authority to depart downward. Such a statement says nothing about the court's

regarding the overstatement of his criminal history and the severity of the punishment for his offense.

At a sentencing hearing the same day, the district court denied Shabazz's motion for a downward departure, explaining, "Well, the guidelines are the guidelines, they attach certain points to certain events. I don't necessarily agree with the guidelines. As a matter of fact, in some instances, I violently disagree with the guidelines. I am bound by it, however, so I'm denying your motion." Shabazz himself orally requested that the court set aside his plea agreement based on Curtis's provision of legal services while suspended from the practice of law and a representation by Curtis that the applicable guideline range would be forty-one to fifty-one months' imprisonment. The district court determined that Curtis had not been suspended at the time Shabazz entered into the plea agreement and so declined to set aside his plea. The court then imposed a sentence of sixty-three months' imprisonment, and this appealed followed.

## III. Calculation of Defendant's Offense Level for Obstruction of Justice by Reference to the Underlying Offense Obstructed

We give "due deference to the district court's application of the guidelines to the facts," 18 U.S.C. § 3742(e), and review findings of fact for clear error. *United States v. Kushmaul*, 147 F.3d 498, 500 (6th Cir. 1998). The district court's application of the guidelines to calculate a defendant's offense level presents a question of law that we review de novo. *United States v. Perkins*, 89 F.3d 303, 307 (6th Cir. 1996). If the district court imposes a sentence based on an incorrect application of the guidelines, we must remand for resentencing. 18 U.S.C. § 3742(f)(1). Rule 52(a) of the Federal Rules of Criminal Procedure creates an exception to this directive when, on the record as a whole, the error does not affect selection of the sentence imposed. *Williams v. United States*, 503 U.S. 193, 203 (1992).

The guideline to which the court must look first in sentencing a defendant convicted of obstruction of justice is

section 2J1.2, which provides for a base offense level of 12. The specific offense characteristics of that section require that if the offense "resulted in substantial interference with the administration of justice, increase by **3** levels." U.S.S.G. § 2J1.2(b)(2). The cross reference contained in section 2J1.2 requires that "if the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above." U.S.S.G. § 2J1.2(c)(1).

The Accessory After the Fact guideline provides for a base offense level "**6** levels lower than the offense level for the underlying offense, but in no event less than **4**, or more than **30**." U.S.S.G. § 2X3.1(a). Application Note 1 to that guideline section defines "underlying offense" as "the offense as to which the defendant is convicted of being an accessory. Apply the base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant; *see* Application Note 10 of the Commentary to § 1B1.3 (Relevant Conduct)."

Application Note 10 of the Commentary to section 1B1.3, in turn, provides that "In the case of solicitation, misprision, or accessory after the fact, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known or reasonably should have been known, by the defendant."

Applying this framework to Shabazz's obstruction conviction, the sentencing court was required first to determine whether his obstruction called for the three-level increase provided by U.S.S.G. § 2J1.2(b)(2). If so, the offense level would rise to 15. Because Shabazz's offense involved obstructing the prosecution of a criminal offense, the court was then required to determine the offense level under the cross-referenced Accessory After the Fact guideline, U.S.S.G. § 2X3.1; this in turn, required the court to determine the offense level for the offense to which Shabazz was an

charges for which the government prosecuted Corrado, not just those on which it obtained convictions.

This argument encounters several difficulties. First, the definition of "underlying offense" in section 2X3.1 specifically directs the use of the offense level of the underlying crime of *conviction*, not all offenses for which a principal stood trial.[3] A plain reading of section 2J1.2, which requires calculation of the offense level under section 2X3.1 for comparative purposes, further suggests that in following the cross-reference the sentencing court should employ the definitions of section 2X3.1. In fact, it would be anomalous for the guidelines to direct the calculation of a defendant's offense level under a particular provision without using that section's definitions. Finally, our decision in *Miller* forecloses adoption of the approach urged by the government. There, we expressly relied on the definition of "underlying offense" in section 2X3.1 to determine the proper guideline range for obstruction of justice. *Miller*, 161 F.3d at 989. The definition of "underlying offense" supplied by the relevant guidelines affords the government considerable latitude to adjust a defendant's base offense level under section 2X3.1 upward so long as the prosecutor lays a sufficient factual predicate for doing so.

---

[3]This language also forecloses the government's harmless error argument, which depends upon entry of a post-conviction judgment of acquittal of the section 924(c) offenses with which Corrado was charged. Here, the district court found that Shabazz "pled guilty to obstruction of justice for being an accessory after the fact on all the counts that Corrado was convicted of." Since the court that tried Corrado did not enter a judgment of conviction on the section 924(c) offenses, the district court's interpretation of the plea agreement excludes these offenses from the scope of Shabazz's guilty plea, and section 2X3.1's definition of "underlying offense" does not by its terms encompass charges that did not result in convictions. Therefore, except to the extent that the charges on which Corrado was acquitted might fall within the scope of relevant conduct, they have no bearing on proper application of the Obstruction of Justice guideline in Shabazz's case.

accountable for the specifics of his cover-up. This is contrary to the purpose of Application Note 1.

*Id*. In this case, the criticism runs in the opposite direction. Affirming the district court would punish a defendant based on all the "aggravating factors" of the underlying offense obstructed without regard for his knowledge of the specifics of that crime.

Additionally, our reading reconciles enhancing a defendant's offense level for obstruction of justice in particularly serious cases with punishing a defendant for his own conduct and establishing the requisite mens rea when a defendant's culpability derives from the underlying offense of a principal. *Cf, e.g.*, *United States v. Graves*, 143 F.3d 1185, 1189 (9th Cir. 1998) ("[T]he accessory statute specifically requires that an accessory know that an offense against the United States has been committed, and thus imposes a knowledge requirement that is independent of and in addition to that required to establish guilt on the part of the offender who committed the primary offense."). *Accord United States v. Godwin*, 253 F.3d 784, 786-87 (4th Cir. 2001) (relying on our discussion of the proper application of the aider-and-abettor guideline, U.S.S.G. § 2X2.1, in *United States v. Hendrick*, 177 F.3d 547 (6th Cir. 1999), to reach the conclusion that section 2X3.1 requires that "the district court start with the base offense level for the underlying offense . . . .").

To avoid a remand for resentencing, the government urges us to adopt the Eleventh Circuit's definition of "underlying offense" for purposes of the section 2X3.1 cross-reference. Under this approach, the definition found in the Accessory After the Fact guideline and its cross-reference to section 1B1.3 do not apply for purposes of U.S.S.G. § 2J1.2. *United States v. McQueen*, 86 F.3d 180, 183 (11th Cir. 1996). Rather, the government asserts that "underlying offense" means the offense that was the object of the obstruction so that Shabazz's obstruction of justice would encompass all

accessory—that is, Corrado's offense—applying the base offense level for that offense plus any applicable specific offense characteristics of Corrado's offense that were known, or reasonably should have been known by Shabazz. This calculation required the district court to include Corrado's relevant conduct of which Shabazz knew or reasonably should have known. If the offense level resulting from this calculation is greater than the offense level calculated pursuant to U.S.S.G. § 2J1.2(b)(2), then the greater offense level must be applied. *See Miller*, 161 F.3d at 989.

This appeal raises a question of first impression in the interpretation and application of U.S.S.G. § 2X3.1: whether the base offense level determined under that guideline by reference to the underlying offense obstructed begins with the total offense level or the base offense level of that underlying offense. Put in the context of this case, the issue is whether the district court erred by calculating Shabazz's offense level based simply on Paul Corrado's total offense level, which included adjustments for multiple counts, role in the offense, and specific offense characteristics.

Though hardly a model of clarity, the plain language of the guidelines resolves the issue. Application Note 1 to section 2X3.1 directs the sentencing court to "[a]pply the *base offense level* [of the underlying offense obstructed] plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant." U.S.S.G. § 2X3.1, comment. (n.1) (emphasis added). The commentary to section 1B1.3, brought in by the cross-reference in section 2X3.1, extends the knowledge requirement to "all conduct relevant to determining the offense level for the underlying offense[.]" U.S.S.G. § 1B1.3, comment. (n.10). This cross-reference allows adjustments to a principal's base offense level to enter into determination of an accessory-defendant's base offense level, but only if the defendant had knowledge of those elements that would adjust the underlying base offense level of the principal. In the absence of factual findings regarding Shabazz's knowledge of those circumstances that increased Corrado's base offense

level, the district court erred by simply adopting Corrado's *total* offense level of 33 as a component of Shabazz's base offense level.

Although the district court reached an intuitively appealing resolution to this problem, its approach encounters difficulties both as a matter of law and based on the facts before it at resentencing. By sentencing Shabazz based on Corrado's total offense level, the district court reads section 2X3.1's cross-reference to the commentary to section 1B1.3 out of the guideline because section 2X3.1 would direct adjustment of a defendant's base offense level, depending on the defendant's knowledge, only for the underlying specific offense characteristics of a principal. Other sentencing modifications to the principal's offense level would adjust the base offense level of a defendant by operation of law. If this view were correct, it is difficult to see why Application Note 1 to section 2X3.1 cross-references section 1B1.3. Factually, the district court reasoned that "because Corrado's base offense level was not adjusted for specific offense characteristics," the portion of the definition of "underlying offense" regarding what Shabazz knew or should have known did not apply. Because Corrado's PSR unquestionably adjusted the base offense levels of his crimes of conviction for specific offense characteristics, in addition to his multiple-count enhancement, however, the record belies this conclusion. Therefore, the guidelines make Shabazz's knowledge of these characteristics relevant to a proper determination of the offense level for the underlying offense in this case. On this score, the district court made no findings regarding what Shabazz knew or should have known at the time he attempted to tamper with the jury in the prosecution of Paul Corrado. Nor do the indictment, plea agreement, initial and revised PSRs, or the transcripts of the change of plea hearing and both sentencing hearings offer factual support from which a court could determine whether Shabazz knew or reasonably should have known of Corrado's offense conduct. Accordingly, the district court erred by adopting the PSR's calculation of Shabazz's offense level based on Corrado's total offense level of 33 without first deciding

whether Shabazz knew or reasonably should have known of the adjustments to Corrado's base offense level based on his role in the offense, multiple counts, and specific offense characteristics.

Reading the guidelines to impose a knowledge requirement before incorporating adjustments to the base offense level of an underlying offense into a defendant's base offense level renders any such adjustment appropriate upon a showing of a defendant's knowledge. This approach results in consistent treatment for adjustments for role in the offense, specific offense characteristics, and other sentencing factors and avoids creating one rule for a defendant's knowledge of specific offense characteristics and another for other underlying adjustments.

We find support for this conclusion in the leading case discussing section 2X3.1, our decision in *United States v. Miller*, 161 F.3d 977 (6th Cir. 1999). There, we held that the defendant's offense level should have been increased because he had knowledge of the specific offense characteristics of the underlying offense. *Id.* at 991. In reaching this conclusion, we stressed the fundamentally factual nature of determining a defendant's base offense level under section 2X3.1. "The Guidelines reduce the magnitude of punishment by six levels to reflect the lesser level of involvement, but nonetheless peg the defendant's sentence to the specific crime he *knew* he was covering up. It only makes sense to look at the defendant's knowledge when the defendant acted." *Id.* at 990 (emphasis added). We also criticized the district court's reading of section 2X3.1, which focused on the defendant's knowledge at the time the principal committed the offense even if the defendant later acquired knowledge of specific offense characteristics and proceeded to obstruct justice anyway.

Under the district court's construction, a defendant who knows nothing about the specifics of a crime when the principal acted, but then later learns of the specifics and nonetheless agrees to cover up the crime will not be held