**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert L. CARPENTER, Defendant–**
**Appellant.**

No. 00–5872.

United States Court of Appeals,
Sixth Circuit.

Dec. 26, 2001.

Before MERRITT, CLAY and GILMAN, Circuit Judges.

CLAY, Circuit Judge.

Defendant, Robert L. Carpenter, appeals from the judgment of conviction and sentence entered by the district court on June 7, 2000, following Defendant's guilty plea conviction to one count of carjacking murder in violation 18 U.S.C. §§ 2119 & 2; one count of using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(12)(a)(ii); and one count of killing a potential federal witness in violation of 18 U.S.C. § 1512(a). On appeal, Defendant challenges the voluntariness of his plea; claims that the district court erred in failing to hold a competency hearing; and claims that his counsel was ineffective in that he failed to recognize that Defendant was incompetent and incapable of entering into a knowing plea. For the reasons set forth below, we **AFFIRM.**

## BACKGROUND

### Procedural History

On June 29, 1999, a federal grand jury sitting in the Western District of Tennessee returned a three-count indictment against Defendant and a co-defendant, his brother Antonio Carpenter. Count I of the indictment charged Defendant with carjacking murder in violation 18 U.S.C. §§ 2119 & 2; Count II charged Defendant with using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(12)(a)(ii); and Count III charged Defendant with killing a potential federal witness in violation of 18 U.S.C. § 1512(a). Defendant was arrested on July 7, 1999; arraigned on July 26, 1999; and on August 2, 1999, the district court appointed two attorneys experienced in handling possible death penalty cases inasmuch as the charges in this case involved possible capital offenses. On August 9, 1999, the district court autho-

rized funds for Defendant to hire defense investigators and experts.

The government filed a notice of intent to seek the death penalty against both Defendant and Antonio Carpenter on January 5, 2000. Defendant filed motions to preclude the government from seeking the death penalty based on Defendant's alleged lack of mental competence and the manner in which the government presented a "package deal" plea agreement.

A jury trial ensued on March 27, 2000, and during jury selection on March 29, 2000, Defendant changed his plea to guilty on all three counts of the indictment. Defendant's co-defendant, Antonio, also changed his plea to guilty on all three counts of the indictment. The plea agreements for both Defendant and Antonio provided that the government would not seek the death penalty in exchange for their pleas. The trial court entered an order on the change of pleas on March 31, 2000.

A sentencing hearing was held on June 6, 2000, and thereafter Defendant was sentenced to three consecutive life sentences. Judgment was entered on that same day, and about two weeks later on June 19, 2000, Defendant's trial counsel withdrew from the case. Proceeding *pro se*, Defendant filed a notice of appeal in reference to the appeal that is now before the Court. Thereafter, on June 30, 2000, the district court appointed new counsel to represent Defendant on appeal.

### Facts

The following facts were taken from Defendant's change of plea hearing and Presentence Report ("PSR"). On June 15, 1999, at about 1:00 p.m. in the afternoon, the victim, Barbara Ann Lee, was driving her green Chevolet Blazer and pulled into a Sonic Drive–In restaurant. When the Sonic carhop started out to Lee's Blazer with the order, the carhop saw two men

forcing their way into Lee's vehicle with a gun. The carhop immediately rushed back into the Sonic and employees called 911.

At about the same time as the 911 call was received by the police, Collierville Police Department ("CPD") Patrolman Geno Raffo was flagged down by a passing motorist, and was advised that a green Chevrolet Blazer was travelling westbound on Highway 72 with a male subject holding what appeared to be a shotgun to the head of a white female. The CPD officers began searching the area for the vehicle, but were unable to locate it. Upon investigating the 911 call, the police were able to learn that Lee worked at New Venture Farms; that she had left work a short time earlier to have lunch at the Sonic; that prior to going to the Sonic, she stopped at an Eddie Bauer store to purchase several items of clothing for her husband, and that she had made a stop earlier that morning at a bank where she withdrew $300 in cash.

In the parking lot of a NAPA Auto Parts store that is located next to the Sonic Drive–In in question, police officers found what appeared to be an abandoned Buick automobile. Witnesses at both the Sonic and NAPA store linked the Buick to the incident involving Lee. Police officers ran a check on the Buick and found it registered to Robert L. Carpenter, 4680 Yager Road, in Fayette County, Tennessee. A detective familiar with both Defendant and the location at 4680 Yager Road, went there to investigate. Upon arriving, the detective spoke with Annie Benton Carpenter, the mother of Defendant and Antonio Carpenter. Annie claimed that she had not seen Defendant or Antonio in several days; however, after being apprised of the gravity of the situation, Annie admitted that she had seen Defendant and Antonio earlier in the day in Defendant's blue and tan Buick, and that Eric Glover, a juvenile, was with them.

The detective investigating the house contacted the Fayette County Sheriff's Department and advised that the three individuals of whom Annie spoke were possible suspects in the carjacking of Lee at the Sonic in Collierville. Shortly after 2:00 p.m., Fayette County officers arrived at the Yager Road location, and saw no sign of the three men, Annie, or the Green Blazer. The only persons present at the house were several juveniles, all of whom were siblings of Defendant and Antonio. The juveniles all advised the officers that they had not seen Annie, the men, or the Blazer that day. The Fayette County officers left the home and continued searching for the Blazer near Moscow, Tennessee.

At about 3:00 pm, Fayette County Investigator Chuck Pugh returned to 4680 Yager and set up a still-watch on the residence. The 4680 Yager location is about twenty-five miles from the Sonic where Defendant was seen with Lee, and the house sits back about 600 feet from the road with a long access dirt road leading to and past the house. This dirt road continues on past the house, runs alongside a field, and then ends in woods; the road is the only ingress and egress to the area behind the house. Approximately fifteen minutes later, Investigator Pugh observed the green Blazer exiting the residence. Pugh was familiar with Defendant and recognized him as driving the Blazer. Pugh took off in pursuit of the Blazer down Franklin Road and into Marshall County, Mississippi.

The vehicle pursuit continued in Mississippi, along with the assistance of the Mississippi Highway Patrol and the Marshall County Sheriff's Department. The Blazer rammed a Mississippi Highway Patrol vehicle several times before crossing the median and heading back westward toward Mt. Pleasant, Mississippi. The suspects turned into a field, the vehicle came to a stop, and the suspects then fled on foot.

Antonio and Eric were immediately apprehended; however, Defendant escaped immediate capture at this point. Antonio was taken into custody and told officers that Lee's body was in the woods behind the 4680 Yager Road address, and that Defendant had beaten her to death. The police returned to the Yager Road address and found Lee's lifeless body partially hidden in the woods alongside the dirt road. There were what appeared to tire marks on Lee's clothing and a two-inch laceration on the rear of her head. She had suffered extensive injuries, including a crushed larynx, abdomen, pelvis and chest. The Fayette County medical examiner also observed several bruises on Lee's arms and chest.

About 8:30 p.m. that evening, Defendant was captured approximately three-quarters of a mile from where the Blazer had stopped in a field. Defendant was hiding in an old junk car behind a farmhouse and was wearing the clothing that Lee had purchased for her husband that morning at the Eddie Bauer store. On the night of their arrests, Defendant, Antonio, and Eric were advised of their rights and all three made written statements admitting to taking part in the carjacking. Antonio and Eric blamed Defendant for actually killing Lee, while Defendant, on the other hand, blamed Antonio and Eric for the killing.

On August 1, 1999, while being held in custody at the Haywood County, Tennessee jail, Defendant and Antonio attempted to escape. The men assaulted and overpowered a jail guard and made it onto the roof of the jail before being apprehended.

## DISCUSSION

### I. Whether the District Court Erred in Determining that Defendant's Plea was Knowingly and Voluntarily Entered

▇▇ Defendant first argues that the district court erred in determining that his Rule 11 guilty plea was knowingly and voluntarily entered. This Court may hear a challenge to a Rule 11 proceeding on direct appeal. *See United States v. Van Buren,* 804 F.2d 888, 890 (6th Cir.1986). A technical failure to comply with Rule 11 does not require vacating the guilty plea. *See United States v. Syal,* 963 F.2d 900, 904 (6th Cir.1992). We review a district court's compliance with Rule 11 under a harmless error standard. *Id.* The district court's determination of a defendant's competency, knowingness, or voluntariness for purposes of entering into a plea agreement are factual findings reviewed for clear error. *See United States v. Branham,* 97 F.3d 835, 855 (6th Cir.1996); *United States v. Ashe,* 47 F.3d 770, 775–76 (6th Cir.1995).

▇▇ Federal Rule of Criminal Procedure 11 sets forth the proper procedure to be followed by a district court in accepting a guilty plea. The purpose of Rule 11 is to insure that a defendant pleading guilty understands the nature of his applicable constitutional rights, that his plea of guilty is voluntary with a full understanding of the nature of the crime charged and the consequences of the plea, and that a factual basis exists for the crime to which the plea is being offered. *See United States v. Goldberg,* 862 F.2d 101, 106 (6th Cir.1988). Stated differently, a guilty plea must be competent, knowing, and voluntary. *See Godinez v. Moran,* 509 U.S. 389, 396–97, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). The competency standard for pleading guilty is identical to that for standing trial. *Id.* The inquiry is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). A guilty plea is considered knowing and voluntary if the defendant understands "the significance and consequences of a particu-

lar decision and ... the decision is uncoerced." *Id.* at 401 n. 12 (citations omitted).

On appeal, Defendant argues that the trial judge failed to comply with the mandates of Rule 11 in two respects. First, Defendant claims that the district court erred in determining that Defendant entered into the plea "intelligently" or "knowingly" inasmuch as Defendant contends that he was not competent to enter into the plea. In addition, Defendant claims that the district court erred in determining that Defendant entered into the plea voluntarily. We disagree with Defendant's claims, and will address each claim in turn.

### A. Whether the district court clearly erred in finding Defendant competent to enter into a plea of guilty

Defendant argues that the district court erred in finding that Defendant entered into the plea knowingly and intelligently, because even though the court was informed that Defendant had undergone extensive psychological examinations and was found to be competent to plead guilty, the court was also informed that Defendant had an IQ between 60 and 70. Defendant contends that for public policy reasons, a person who demonstrates significant characteristics of mental retardation should be foreclosed from pleading guilty to a crime. Defendant's authority in support of his contention that an IQ of 70 meets the requirements for mental retardation is an internet web site to an article entitled *"Introduction to Mental Retardation"* at *www.thearc.org/faqs/rmrqa.html.* Defendant offers no other authority for his public policy argument.

 We disagree with Defendant's contention, and hold that the district court did not clearly err in finding that Defendant possessed the competency to know-

ingly enter into a plea agreement. As noted above, the competency standard for pleading guilty is identical to that for standing trial, where the inquiry is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.' " *See Godinez,* 509 U.S. at 397; *see also Penry v. Lynaugh,* 492 U.S. 302, 333–34, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that the district court did not err in finding mentally retarded person competent to stand trial). Defendant invites this Court to abandon this standard and instead adopt a bright line rule solely based upon IQ, allegedly for public policy reasons. Aside from Defendant's argument lacking in authoritative support, this Court is not at liberty to act in contravention of Supreme Court precedent. *See Henderson v. Collins,* 262 F.3d 615, 622 (6th Cir.2001) ("This court is bound by the decisions of the Supreme Court."). Moreover, the facts adduced at Defendant's lengthy change of plea hearing support the district court's finding that Defendant "is in fact fully competent and capable of entering an informed plea" such that "he is aware of the nature of the charges and the consequences of the plea, and that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of each of the offenses contained in each of the three counts of the indictment." (J.A. at 330.)

At the plea hearing, the court asked Defendant if he had ever been treated for a mental illness of any kind. In response, Defendant answered in the affirmative; however, he could not remember when he was treated or for what type of mental illness. Defendant informed that court that he was in special classes in school and had gotten up to the tenth grade before dropping out; that he could read "pretty

well;" that his lawyers had assisted him in understanding anything that he could not read; that he had worked in the past as a french fry cook at Wendy's and McDonald's, and that he worked in the warehouse for Pepsi Cola where he drove a forklift. Defendant also informed the court that although he did not have a driver's license, he drove "pretty well" and had been driving for a number of years. Defendant stated that he had spoken with his lawyers, brothers, mother, aunt, and investigators about his decision, and added that he had thought about pleading guilty for at least two months before doing so. Upon further inquiry Defendant informed the court that he was not taking any prescription medication, and that he was not under the influence of any other drugs or alcohol at the time of making the plea. In addition, Defendant stipulated that he had been examined by defense-hired psychologists and/or psychiatrists and found mentally competent to stand trial and/or plead guilty. Defendant also acknowledged the nature of the crimes to which he was pleading guilty, and that by pleading guilty he would spend "the rest of [his] natural life" in prison. (J.A. at 289–93.) Finally, Defendant acknowledged that the decision to plead guilty was not coerced and was made freely by him and him alone.

Based upon these findings, we conclude that the district court did not clearly err in finding defendant competent, such that his plea was made knowingly. *See Godinez,* 509 U.S. at 401 n. 12 (finding that guilty plea is considered knowing and voluntary if the defendant understands "the significance and consequences of a particular decision and . . . the decision is uncoerced"). A review of the plea hearing indicates that Defendant understood the nature of the charges against him and the consequences of pleading guilty to these charges—that he would spend the rest of his natural life in prison—such that no error occurred. *Id.*

**B. Whether the district court clearly erred in finding Defendant entered into the plea voluntarily**

■ Defendant also claims that the district court erred in finding that Defendant entered into the plea voluntarily inasmuch as the government offered Defendant a "package deal" where in order for the government to withdraw its notice to seek the death penalty, both Defendant and his brother Antonio had to plead guilty. In support of his claim, Defendant cites and relies upon an unpublished case from this circuit, *United States v. Hess,* No. 91–4115, 1992 WL 322381, at *5 (6th Cir. Nov.5, 1992), wherein this Court stated that guilty pleas made in consideration of lenient treatment of persons other than the accused "pose a greater danger of coercion than purely bilateral plea bargaining, and, therefore, special care is required to ascertain the voluntariness of guilty pleas entered under such circumstances." Although Defendant characterizes this statement made in *Hess* as being "well accepted," *see* Defendant's Brief at 18, *Hess* actually characterizes this proposition as being a "general consensus." *See Hess,* 1992 WL 322381, at *6.

■ In any event, we are not persuaded by Defendant's claim where, after citing this statement from *Hess,* Defendant's sole argument that the district court clearly erred in finding Defendant entered into the plea voluntarily is that the court's decision goes against public policy. As *Hess* itself indicates, there is no hard and fast rule against the government's predicating a guilty plea on the government's lenient treatment of persons other than the accused. *See Hess,* 1992 WL 322381, at *6. In addition, and perhaps most astonishing, the record indicates that Defendant provided valuable information to the government implicating Antonio in the crime,

and that Defendant vigorously sought to plead guilty; it was Antonio who initially did not wish to plead guilty. *See* J.A. at 228–29. The record also indicates that the government predicated its plea offer on both defendants pleading guilty inasmuch as the purpose behind the plea was to avoid causing Lee's family, which had already greatly suffered, the trauma of going through a trial. Therefore, if the government had allowed Defendant to plead guilty but allowed Antonio to go to trial, the government would have been defeating the purpose of offering Defendant a plea bargain. Moreover, the government may properly condition any plea in a case upon all defendants pleading guilty. *See United States v. Usher*, 703 F.2d 956, 959 (6th Cir.1983) (finding no justification for withdrawal of a guilty plea where the ability of a defendant's wife to plead was conditioned upon the defendant's own plea). In short, neither the record below nor the case law supports Defendant's claim that the district court's finding that Defendant voluntarily entered into the plea is clearly erroneous on the basis that the plea offer was a "package deal." Accordingly, Defendant's claim in this regard is without merit, as was his first claim, such that there is no Rule 11 violation here.

## II. Whether Defendant was Denied the Effective Assistance of Counsel where his Counsel Knew or Should Have Known that Defendant was Incompetent to Enter a Plea

■■■ This Court ordinarily does not review a claim of ineffective assistance of counsel on direct appeal because the lack of an adequate factual record. *See United States v. Jackson*, 181 F.3d 740, 747 (6th Cir.1999). Instead, these claims are properly brought in a post-conviction proceeding under 28 U.S.C. § 2255 after the parties have had an opportunity to fully develop the record. *See United States v. Rahal*, 191 F.3d 642, 645 (6th Cir.1999).

Although this Court may consider the issue even if not raised before the district court if the record is adequate to permit review of counsel's performance, we decline to review Defendant's claim on this record. *See United States v. Shabazz*, 263 F.3d 603, 611 (6th Cir.2001).

## III. Whether the District Court Erred in not Ordering a Competency Hearing after Defendant Pleaded Guilty

■■■ Defendant failed to request a competency hearing below. Therefore, to the extent that this issue is considered at all, it shall be addressed under a plain error standard of review. When reviewing a claim under a plain error standard, this Court may only reverse if it is found that (1) there is an error; (2) that is plain; (3) which affected the defendant's substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of judicial proceedings. *See United States v. Carter*, 236 F.3d 777, 783–84 (6th Cir. 2001).

■■■ In *Pate v. Robinson*, 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the Supreme Court held that when evidence of a defendant's mental state raises doubt as to his competence, due process requires a competency hearing. Here, as in indicated in the discussion of the prior issues, Defendant stipulated to being found competent to enter a plea, and the court went to great lengths to properly examine Defendant as to his competency. After doing so, the court expressed its careful attention to this issue as follows: "As to Robert Carpenter the Court has been interested throughout the proceedings to make sure that he fully met the competency requirements and is capable, if he choose to, of entering an informed plea." (J.A. at 329–30.)

Accordingly, the district court made a careful determination of Defendant's men-

tal state at the plea hearing for the purpose of evaluating Defendant's competency. There is no indication in the record to suggest that Defendant gave the district court any reason to question his mental state. Although Defendant contends that the district court was aware of his low IQ, as stated, a low IQ alone is not definitive of competency. As a result, no error occurred and Defendant's claim fails.

## CONCLUSION

For the reasons set forth above, Defendant's judgment of conviction and sentence is **AFFIRMED**.