RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

     *v.*

                                          No. 09-3660

KARL DEMMLER,

                *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 07-00209-002—Algenon L. Marbley,
Michael H. Watson, District Judges.

Argued: October 14, 2010

Decided and Filed: August 23, 2011

Before: GIBBONS and WHITE, Circuit Judges; MALONEY, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Dennis C. Belli, Columbus, Ohio, for Appellant. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Dennis C. Belli, Columbus, Ohio, for Appellant. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

    JULIA SMITH GIBBONS, Circuit Judge. Defendant–Appellant Karl Demmler was convicted of obstruction of justice, witness tampering, and conspiracy. He was sentenced to eighty-four months' imprisonment. On direct appeal, he argues that the

_____

[*] The Honorable Paul L. Maloney, Chief United States District Judge for the Western District of Michigan, sitting by designation.

district court deprived him of his constitutional right to a fundamentally fair trial and a reliable verdict by refusing to give an entrapment instruction to the jury; the district court plainly erred in defining the corrupt intent required to convict Demmler as "characterized by improper conduct"; and the district court's eight-four month prison sentence was unreasonable because of "significant procedural error" in the district court's calculation of the advisory guideline imprisonment range. For the reasons set forth below, we affirm Demmler's conviction and sentence.

I.

Demmler and Lance Poulsen became friends in Columbus, Ohio, in the mid-1980s. The two men played golf and traveled together, and, in the early 1990s, Demmler served as best man at Poulsen's wedding. Poulsen owned a small insurance company, and Sherry Gibson was one of his employees. Gibson met Demmler through Poulsen, and the three became friends.

In 1991, Poulsen formed NCFE, a company focused on financing health-care providers by securitizing and pooling their accounts receivable. Sherry Gibson ascended the ranks of NCFE and ultimately became Vice-President of Compliance. By 1998, a senior advisor of Chase JP Morgan bank, which had become a part owner of NCFE, was recommending changes in NCFE's accounting department, including the removal of Gibson. Gibson testified that, after NCFE made the recommended changes, she felt Poulsen was shifting the blame to her for certain accounting discrepancies.

Ultimately fraud, including the accounting discrepancies, ended NCFE's operations. The FBI searched the company, a crisis management team took over, and NCFE declared bankruptcy. Shortly afterwards, Gibson learned she was the target of an FBI and SEC investigation into the company. In April 2003, Gibson pled guilty to conspiracy to commit a massive securities fraud that had caused over two billion dollars in losses to clients and investors. Gibson admitted that "the entire company worked on defrauding investors." Her plea agreement required her to meet with prosecutors and truthfully answer all questions regarding NCFE. The district court accepted Gibson's plea, granted the government's motion to reduce her sentence in light of her cooperation,

and sentenced Gibson to four years' imprisonment beginning in October 2004. Gibson also had to pay $420,000 in restitution.

Demmler and Gibson continued their friendship. They corresponded while Gibson was in prison, and Demmler sent her money and came to visit her. Gibson testified that she was surprised to hear from Demmler so often and that she was unsure of Demmler's motives. However, because the two had a long-standing friendship, which included Demmler's sending Gibson a birthday card for eighteen straight years, the conduct was not entirely surprising.

While Gibson was in prison, Demmler told her during his first visit, in July 2006, that she could get her sentence overturned, a prospect of which Gibson later said she was wary. In January 2007, shortly before Gibson finished her prison sentence, Demmler wrote her a letter in which he mentioned that Poulsen had "a $3 billion lawsuit against Chase Bank" and that "there is still hope you can get your assets back." Gibson wrote back and expressed her desire to find "a way to reclaim [her] assets without nullifying, voiding or in any way imperiling [her] plea agreement."

After being released from prison, Gibson asked Demmler for assistance in finding a place to live. Then, on June 19, 2007, Gibson thought of Demmler when driving by their favorite restaurant. She called him, and he proposed that they meet for dinner that evening.

At dinner, Demmler began by saying, "Business first." He mentioned having met with Poulsen and told Gibson that Poulsen would like to make her "whole" if her testimony as a material witness in Poulsen's trial would help Poulsen "win his case." Demmler suggested that Gibson would receive one or two million dollars if she agreed. He promised to be in touch with Poulsen soon and recommended that he and Gibson meet weekly.

Gibson believed that Demmler was offering her a bribe in exchange for favorable testimony. For this reason, on June 20 Gibson contacted the FBI. From that point on, Gibson followed the instructions of federal investigators when meeting or corresponding

with Demmler. Gibson's meetings and phone conversations with Demmler were recorded.

In the conversations between Demmler and Gibson, Demmler told Gibson that Poulsen wanted to help her so that he might "win his case," that Gibson should "not remember" what had happened, that Gibson should watch the movie *The Godfather* for examples of how she should testify, that Demmler would manage funds for Gibson in "an existing account outside of the country" for a ten-percent fee, that she should "prevaricate," and that he understood if she needed "to have some moolah to not remember." Demmler also asked Gibson to email him with details of testimony she could alter. He cautioned Gibson not to put her name on the email, and he suggested she explicitly ask Poulsen for $25,000. He promised Gibson, "whatever you get, it's not going to be trackable." But then he noted that if anyone found out about the arrangement, "[W]e'd all be in . . . a big bag of shit."

The FBI also issued subpoenas for Demmler's phone records, which indicated that Demmler and Poulsen had spoken more than thirty times between January and June of 2007. The FBI then obtained a pen register on Demmler's cellular phone. On August 6, 2007, Special Agent Jeffrey Williams of the FBI submitted an affidavit in support of the application for the interception of wire communications from Demmler's cellular phone. The wiretap was authorized on that same day. The recorded conversations provided the following evidence: discussions between Poulsen and Demmler about getting Gibson a new attorney who was preapproved by Poulsen; multiple conversations between Poulsen and Demmler and Demmler and Gibson about how Gibson would be paid; instructions on how Gibson should answer prosecutors' questions and how she should testify; Demmler's statement to Poulsen that he should pay Gibson with funds that were not trackable and that he was pleased that Gibson, in a few years, "went from a hostile witness to one that can be . . . worked"; and Poulsen's and Demmler's concerns about discussing Gibson over the phone.

Demmler took questionable actions too. The day he was arrested, Demmler was at the airport on the way to Venezuela. He had just handed Gibson a blank check drawn

on the account of "Paragon Legal Services" with the promise that Poulsen would transfer funds into the account once Gibson had contacted one of three lawyers whose names she had been given.

Demmler and Poulsen were tried together. At trial, the jury heard all of the evidence noted above. Poulsen testified on his own behalf and also presented the testimony of several attorneys. Demmler did not present evidence. His argument, however, was that he did not try to bribe Gibson; rather, he wanted to help her. Demmler states that he knew that Thomas Tyack, an attorney representing Poulsen, believed Gibson had pled guilty unnecessarily. According to Tyack, Gibson was set up to take the blame by lawyers from Jones Day, a law firm in the NCFE bankruptcy matter. Tyack testified at trial that he shared this information with Poulsen and that Poulsen thought Gibson had been "railroaded." Poulsen wanted to see if there were a way to make Gibson "whole," and Tyack told him that if Gibson's guilty plea were vacated, Gibson would be fully compensated by the United States government. Demmler asserts that he merely wanted to help Gibson because he genuinely believed she had been treated unfairly.

In proposed jury instructions, both Demmler and Poulsen requested an entrapment instruction. The district court waited until the end of trial before making a decision on the instruction. After lengthy arguments from Poulsen's attorney that an entrapment instruction was proper, the district court ruled, "I don't believe that there is any evidence that the defendant was not already willing to commit the crime or that the government or someone acting for the government induced or persuaded the defendant to commit it. Hence, the Court will not give the entrapment instruction." Neither party renewed his objection to the jury instructions after they were given.

The jury found Demmler and Poulsen guilty on all counts. Following trial, the United States Probation Office prepared a Pre-sentence Report ("PSR"). The report concluded that the fraud at NCFE was in excess of $2 billion. The report applied an accessory-after-the-fact guidelines range based on an underlying crime of fraud involving a loss of more than $400,000,000.00. The resulting offense level of thirty led

to an advisory imprisonment range of ninety-seven to 121 months, to which Demmler objected.  Demmler argued that he never knew money was lost; he thought NCFE merely had bookkeeping errors.  Demmler also argued that it was error for him to be considered as an accessory to a crime to which he had no connection.  Instead Demmler asserts that he should have been sentenced without reference to the fraud guidelines, which would have yielded an imprisonment range of fifteen to twenty-one months.  The district court denied Demmler's objections, varied Demmler's sentence downward, and imposed a sentence of eighty-four months in prison.

Demmler timely filed a notice of appeal.

## II.

Demmler first argues that the district court's refusal to grant an entrapment instruction deprived him of his constitutional right to a fair trial and a reliable jury verdict.

## A.

As a preliminary matter, the parties dispute what standard of review applies.  The government argues that, because Demmler's attorney did not offer an argument in support of the entrapment instruction or object when the district judge refused to grant it, the plain-error standard of review should govern this matter.  *See United States v. McGee*, 173 F.3d 952, 957 (6th Cir. 1999); *United States v. Johnson*, 62 F.3d 849, 850 (6th Cir. 1995).  Demmler responds that where two defendants are tried together, and one party objects, the second party does not have to object as well in order to preserve the matter for appeal if such objection would have been "futile."  *United States v. Ghazaleh*, 58 F.3d 240, 244 (6th Cir. 1995).  We need not address the standard of review because Demmler's claim fails under either standard.

B.

Under the law of this court,

> [a] district judge's refusal to deliver an instruction is reversible error only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.

*United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). An entrapment defense has two elements: (1) "government inducement of the crime, and [(2)] a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002). A defendant is entitled to an entrapment instruction "whenever there is sufficient evidence from which a reasonable jury could find entrapment," *Mathews*, 485 U.S. at 62,[1] but the defendant must provide enough evidence to support both elements of entrapment in order to receive the instruction. *Khalil*, 279 F.3d at 364–65.[2]

---

[1] While acknowledging *Mathews*, Demmler also relies on *United States v. Duncan*, 850 F.2d 1104, 1117 (6th Cir. 1988). He quotes its language relating to the requirement that the defendant's theory of defense be mentioned in the instructions, "even if that evidence is weak, insufficient, inconsistent, or of doubtful credibility." *Id.* (citation and internal quotation omitted). Although not explicit, the clear invitation is that we should sidestep *Mathews*. While *Mathews* is the controlling case, in our view *Mathews* and *Duncan* are not in essential conflict. *Duncan* relates to the requirement that the court mention a defendant's factual theory of defense, upon request, when some support for that theory exists in the evidence. The specific theory at issue in *Duncan* was defendant's argument that he relied in good faith on the advice of an accountant and thus lacked the intent to commit tax offenses. The requirement discussed in *Duncan* predates *Duncan* and is well-established in this circuit. By contrast, *Mathews* relates to the circumstances under which the jury is to be instructed on a legal issue. Although the context in *Mathews* is the defense of entrapment, the rule is a basic, generally well-established one: the court only instructs the jury on a legal issue when the jury has before it sufficient evidence from which to make a finding about that issue, *i.e.*, when it has facts to which it can apply the law about which it is instructed. *Mathews*, 485 U.S. at 63–64; *see also Khalil*, 279 F.3d at 364–65 (holding that a defendant had made an insufficient showing to warrant an entrapment instruction because "he presented insufficient evidence from which a reasonable jury could find a lack of predisposition," which is legally necessary to succeed on the defense of entrapment). The distinction between the principles discussed in the two cases is not as clear as it might be because our court in *Duncan* also disagreed with the district court's assessment of the quantity of evidence and thus veered into expressing a view that some reference to reliance in the portion of the instructions relating to the law was desirable, although it stopped short of requiring the full instruction requested by Duncan. But the portion of *Duncan* quoted by Demmler simply addresses the defendant's factual theory of the case. *Khalil*, decided after Duncan, denies an instruction on a legal issue and demonstrates that Duncan's holding is not as expansive as Demmler suggests.

[2] Had Demmler had come forward with such evidence, the burden would then have shifted to the government to prove predisposition beyond a reasonable doubt. *United States v. Monea*, 376 F. App'x 531, 543–44 (6th Cir. 2010); *United States v. Jones*, 575 F.2d 81, 83–84 (6th Cir. 1978); *see also* Sixth Circuit Pattern Criminal Jury Instruction No. 6.03(6) ("Consider all the evidence, and decide if the government has proved that the defendant was already willing to commit the crime. Unless the

The instruction Demmler requested is identical to the Sixth Circuit Criminal Pattern Instruction 6.03. The instruction contains the two requirements for entrapment spelled out in *Mathews*, and neither party disputes that the instruction is a correct statement of law.  Demmler must show that it was plain error for the district court to have ruled that there was insufficient evidence to grant the instruction.

The key question in determining predisposition is whether law enforcement planted a "criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so."  *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010) (quoting *United States v. Pennell*, 737 F.2d 521, 534 (6th Cir. 1984)).  The factors considered include:

> [t]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of criminal activity was initially made by the Government; whether the defendant was engaged in criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only be repeated Government inducements or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*Id.* (citation omitted).  A district court is justified in denying an entrapment instruction where the evidence "clearly and unequivocally establishes that [the defendant] was predisposed."  *Khalil*, 279 F.3d at 365 (quoting *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990)).

The evidence in this case permits only a finding that Demmler was "clearly and unequivocally . . . predisposed" to committing the crime.  *Id.*  Demmler was the initiator of the offenses here and consistently urged Gibson to act in accord with his wishes. Demmler first raised the idea of Gibson's changing her testimony and repeatedly encouraged her to do so.  The taped phone conversations between Demmler and Poulsen exhibit marked and repeated concern with whether or not Gibson would testify as Demmler and Poulsen wanted.  Demmler spoke of receiving a ten-percent cut from

---

government proves this beyond a reasonable doubt, you must find the defendant not guilty.").

Gibson and other payment for his actions.  Because Demmler acted for profit, was not reluctant to commit the offense, made the initial suggestion of the offense, and had little to no inducement from the government, we find it was not plain error for the district court to refuse to give the entrapment instruction.

Demmler also fails to show that the rejected instruction concerned a point substantial enough to impair the presentation of his defense.  Demmler's defense had nothing to do with entrapment; his theory of defense was that no scheme to obstruct justice ever existed.  Demmler was certainly entitled to offer contradictory defenses. *Mathews*, 485 U.S. at 62–66.  But the importance of the entrapment argument to his overall defense does relate to the criteria we evaluate in plain-error review.

Because no sufficient evidence was offered, the district court was not obliged to give an instruction.  Moreover, Demmler's defense was not substantially impaired.  The district court committed no error in refusing to give an entrapment instruction.

III.

On appeal, Demmler argues for the first time that the district court's jury instruction defining "corruptly" as "characterized by improper conduct, or persuasion characterized by some morally debased purpose" permitted the jury to find him guilty of conduct that is not illegal under the statutes.  Demmler cites the Supreme Court's ruling in *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005), for the proposition that "corruptly" means a "wrongful, immoral, depraved, or evil" state of mind.  Demmler argues that the district court's inclusion of "improper conduct" in its definition of "corruptly" expanded the definition of corruptly beyond the bounds permitted by *Arthur Andersen*.  Because the district court's definition included conduct that is not illegal, thus raising the possibility that he was convicted of engaging in legal conduct, Demmler asserts that the district court committed plain error.

The jury instruction that Demmler now challenges is the jury instruction that he, himself, requested: "Corruptly: Defined—You have been instructed that to sustain its burden of proof, the government must prove that the defendant acted corruptly.  The

Sixth Circuit has defined 'corrupt' as characterized by improper conduct, and 'persuasion characterized by some morally debased purpose.'" Moreover, Demmler requested this instruction in response to a different proposed instruction from the government, which had defined corruptly as "having an improper purpose." Demmler thus induced the error of which he now complains, so his argument falls under the invited error doctrine.

According to the invited error doctrine, when a party has himself provoked the court to commit an error, that party may not complain of the error on appeal unless that error would result in manifest injustice. *Harvis v. Roadway Express Inc.*, 923 F.2d 59, 60 (6th Cir. 1991). The doctrine is based on equitable principles—"courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside. It is based on reliance interests similar to those that support the doctrines of equitable and promissory estoppel." *Id.* at 61. We have employed the invited error doctrine to refuse to exclude otherwise inadmissible evidence, *All Am. Life & Cas. Co. v. Oceanic Trade Alliance Council Int'l, Inc.*, 756 F.2d 474, 479–80 (6th Cir. 1985), and to affirm the denial of a motion for judgment notwithstanding the verdict, *Am. Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 421 (6th Cir. 1984). The jury instruction Demmler challenges here does not result in "manifest injustice" any greater than what we have previously deemed waived by the invited error doctrine. *Cf. Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 251 (6th Cir. 1991) ("[T]he doctrine of 'invited error' is a branch of the doctrine of waiver. Deviation from the rule of waiver is permissible when application of the rule would result in a manifest injustice." (internal citations omitted)). Thus we find that Demmler's appeal on this matter is waived under the invited error doctrine.

IV.

Demmler's third primary argument is that his eighty-four month sentence was unreasonable because of "significant procedural error" in the calculation of the advisory guideline imprisonment range. Specifically, Demmler offers two reasons he should not be held responsible for the underlying criminal fraud in excess of $400 million: (1) the

government did not prove at sentencing by a preponderance of the evidence that Demmler knew or should have known that the NCFE defendants' actions caused $400 million in loss, and (2) Demmler was denied his right, guaranteed by the Confrontation Clause, to challenge the PSR's calculation of loss. We review the district court's legal conclusions regarding application of the sentencing guidelines *de novo* and its factual findings for clear error. *United States v. Anderson*, 526 F.3d 319, 323 (6th Cir. 2008).

The district court adopted the PSR's recommendation. The PSR looked to United States Sentencing Guidelines § 2J1.2 for guidance on obstruction of justice. Section 2J1.2(c) directs the sentencing court to apply § 2X3.1 if the offense involved obstruction of an investigation or prosecution for another offense and § 2X3.1 results in a higher offense level than that dictated by § 2J1.2. The PSR determined that the underlying offenses were "securities and wire fraud" in excess of $400 million, which would lead to an offense level of forty-two. The PSR then reduced the offense level to thirty, the upper-limit permitted by § 2X3.1(a)(3)(A). The district court, having accepted this calculation, then varied the sentence down to eighty-four months from the ninety-seven to 121 month range recommended by the guidelines.

Demmler argues that our precedent only permits enhancement of a base level offense if the defendant had knowledge of the elements of the underlying offense. *United States v. Shabazz*, 263 F.3d 603, 608–09 (6th Cir. 2001); *see also* U.S. Sentencing Guidelines Manual § 2X3.1 cmt. n.1 ("Apply the base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant . . . ."). Demmler asserts that he did not know about the scope of the NCFE fraud and that there was no evidence showing the scope of his knowledge. Because his attorney objected during the sentencing hearing, Demmler argues that Federal Rule of Criminal Procedure 32(i)(3)(B) requires the district court to rule on disputed portions of the PSR. Fed. R. Crim. P. 32(i)(3)(B) ("At sentencing, the court must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute . . . ."). Citing our decision in *United States v. White*, 492 F.3d 380 (6th Cir. 2007), Demmler argues that once the sentencing court is made aware

of a dispute, it "must *actually find facts*, and it must do so by preponderance of the evidence." *Id.* at 416. Because the district court summarily dismissed his objections, Demmler insists the sentencing court did not find facts, as it is required to do. He argues that this "significant procedural error" justifies a remand for resentencing.

Demmler's Rule 32 argument is meritless. Demmler does not challenge the district court's legal understanding of the sentencing guidelines—he challenges whether the facts showed he knew about the size and scope of the underlying crime. The district court found that the NCFE fraud was "a fraud of gigantic proportions" and that Demmler did, in fact, know "the nature and gravity" of the underlying crime. Moreover, the district court found that "the evidence demonstrates . . . you were going to help them conceal it." In short, the district court did rule on Demmler's motion, as required by Rule 32—the district court ruled that the facts proved at trial showed Demmler was aware of the size of the fraud.

Factual determinations are reviewed for clear error. *Anderson*, 526 F.3d at 323. There is no clear error here, because evidence in the record shows that Demmler knew or should have known the scope of the fraud. For example, evidence at trial showed that Demmler told Gibson that Poulsen was preparing a $3 billion lawsuit against Chase Bank, which demonstrates that Demmler was aware of the amount of money at stake. Additionally, on July 14, 2007, Gibson shared an article with Demmler about the guilty plea of Jon Beachem, one of the NCFE coconspirators. The article, which Demmler read, unequivocally stated that "investors lost $1.9 billion." Denise Trowbridge, *Executive Pleads Guilty in Fraud Trial: Man to Testify Against National Century Officials*, The Columbus Dispatch, July 14, 2007. In light of facts such as these, it was not clear error for the district court to rule that Demmler knew or should have known the size of the NCFE fraud.

Demmler, however, offers one additional proposition—that an accessory after the fact must know not merely what the underlying charge is but also that the principal offender actually committed the underlying charged crimes. Demmler again cites our precedent in *Shabazz*, 263 F.3d at 609, but his citation is inapt. Shabazz pled guilty to

offering to swing a jury in the trial of Paul Corrado in exchange for a $25,000 bribe. *Id.* The district court considered the underlying charges and factors against Corrado when sentencing Shabazz. *Id.* Because Shabazz was merely a spectator at the trial who knew a juror and offered to bribe that juror, and because Shabazz pled guilty (so that no trier of fact had determined Shabazz's knowledge of the circumstances increasing Corrado's offense level), we held that it was improper to impute Corrado's offense level to Shabazz without first "deciding whether Shabazz knew or reasonably should have known of the adjustments to Corrado's base offense level based on his role in the offense, multiple counts, and specific offense characteristics." *Id.* It is true that in *Shabazz* we noted the need for proof of Shabazz's knowledge of Corrado's "role in the offense," but this language merely confirms that a court should determine a defendant knew or should have known the scope of the underlying crime before adjusting the offense level. *Shabazz* does not stand for the proposition Demmler asserts; nor are the facts of this case analogous to it.

Rather, this case is analogous to *United States v. Miller*, 161 F.3d 977 (6th Cir. 1988). In *Miller*, multiple defendants conspired to obstruct justice in a case involving weapon possession. We found that the defendants knew that a large number of firearms were involved in the charge they were found guilty of obstructing. *Id.* at 990–91. Because the defendants knew the scope of the weapon possession at the time they conspired to obstruct justice, the court was right to increase their offense levels. *Id.* at 991. Here, because Demmler knew the scope of the NCFE fraud, the court was right to increase his offense level.

*Miller* also helps resolve Demmler's second claim: by not being able to challenge the evidence showing the size of the NCFE fraud, he was deprived of rights under the Confrontation Clause. As *Miller* makes clear, the key question is the defendant's knowledge of the offense charged at the moment he conspires to obstruct justice, not whether the underlying offense's charges were accurate. *Id.* The record unequivocally shows that Demmler knew the size of the charges facing Poulsen when he began to meet

with Gibson and encouraged her to change her testimony.  Because Demmler had knowledge of the offense charged, his Confrontation Clause challenge is meritless.

V.

For the foregoing reasons, we affirm the decision of the district court.