NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0270n.06

No. 12-5810

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 15, 2013*
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

STEPHEN L. SIMS,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

Before: DAUGHTREY, ROGERS, and McKEAGUE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Defendant Stephen Sims pleaded guilty to three counts of bank fraud. The district court then sentenced Sims to 87 months in prison and three years on supervised release, and ordered payment of $2,424,000 in restitution to the Federal Deposit Insurance Corporation (FDIC). On appeal, the defendant contests the calculation of his Guidelines offense level and challenges the district court's determination of the amount of restitution due. We find no reversible error and affirm the judgment in its entirety.

From 2004 into 2008, Sims convinced various individuals to apply for loans in their own names through Oakland Deposit Bank in rural West Tennessee. Rather than allowing those individuals to keep the loan proceeds, however, Sims would refund only ten percent

of the funds to the borrower and take possession of the remaining money, ostensibly to purchase or develop real property. The defendant informed the borrowers that the money kept by him actually was an investment that would pay off for the "investors" upon the sale of the developed realty. In reality, the "investments" never generated a profit, and Sims was forced to pay money back to the "investors" in order to satisfy their loan obligations. Because Sims was not generating income from the properties he purchased, in order to raise the revenue necessary to make the payments on the numerous loans he had orchestrated, he was required to identify yet other individuals he could convince to obtain loans from the Oakland bank. Sims would then use his 90-percent share of those loan proceeds to pay the indebtedness to the earlier borrowers. Not surprisingly, the "borrow-from-Peter-to-reimburse-Paul" scenario could not be maintained, given the dwindling number of potential "investors" in the small Oakland community. Consequently, Sims began taking out additional loans in the names of previous investors, all without the knowledge or acquiescence of those individuals.

This loan-lapping-scheme-gone-awry was explained in another way at Sims's sentencing hearing by Trent Watrous, a certified public accountant and fraud examiner who investigated the improprieties at the Oakland Deposit Bank. Using a specific example, Watrous stated:

> One transaction in particular that comes to mind is where moneys were drawn on three different borrowers, a Pernita Taylor, a Watson, and another party, and it all went to a Roy Ewing. Well, when you go back and look at the files, the three loans never had documentation that their loans could be

taken out in their name and the proceeds of those loans applied to Mr. Roy Ewing, nor in the Roy Ewing file was there documentation saying you can draw upon these other notes. So how funds were flowing from one point to the next when there was no connection between the parties is very interesting. So you had three $11,376 checks prepared, drawn on those loans, flowing to pay off four loans of an unrelated borrower.

Catherine Walker, an agent with the Federal Bureau of Investigation, also testified at the sentencing hearing and recounted that Sims admitted to forging documentation on 44 such unsecured loans in order to obtain a total of $488,250. Additionally, Agent Walker explained that Sims also helped a number of individuals obtain construction loans from the bank in amounts totaling $809,700. Although the proceeds of those loans were to be used to construct or rehabilitate homes in the Memphis area, Walker saw no evidence of any construction that took place in either 2007 or 2008, when a majority of the loans were finalized.

Indeed, other testimony indicated that much of the loan money obtained by Sims was converted to the defendant's own use. For example, Sims confessed to Watrous "that approximately two to 300,000 had been spent on [Krystyle,] the rapper he was sponsoring[1], [and] three to 400,000 was related to his personal and business expenses," including $220,934 for tuition for his sons at a Montessori school.

---

[1] According to the presentence report prepared by the United States Probation Office, "that money was paid for studio time, promotional items, t-shirts, and other items, as well as hosting larger concerts" for the young rapper, but "the investment was lost" "due to Krystyle's voice changing." Other information in the presentence report suggests that Sims drastically underestimated to Watrous the cash outlay for Krystyle's promotion. When speaking with the probation officer, Sims "estimated that he gave [the rapper's] father $300,000 to $400,000 over a three-year period" and "spent approximately $450,000 to $500,000" on three large concerts.

Dana English, a field supervisor with the FDIC, testified that he examined the records of the Oakland Deposit Bank and calculated that the bank's "total losses related to Mr. Sims was $2,279,000," an amount that equaled "the bank's last three full years of earnings at that point in time." Watrous estimated, however, that the bank's losses were $2,424,000, the slightly greater figure constituting "the amount of principal [that was] outstanding on those loans and was written off by the bank as unrecoverable."

Needless to say, losses of either amount of money were devastating to the rural bank, causing it to become insolvent. According to the FDIC field supervisor, "[t]he losses for Mr. Sims alone would have materially affected the bank's capital ratio," lowering that figure from a "satisfactory" 7.21 percent to 5.52 percent. English further testified that the losses that precipitated that drastic drop in the capital ratio "substantially jeopardize[d] the safety and soundness of Oakland Deposit Bank."

Presented with this testimony, the district judge found that the bank's loss was greater than $1,000,000 but less than $2,500,000. *See* USSG § 2B1.1(b)(1)(I) (2011). The court further concluded that the offense involved more than ten victims, *see* USSG § 2B1.1(b)(2)(A)(i) (2011), that Sims had used the identification of other individuals without their permission to perpetrate the crime, *see* USSG § 2B1.1(b)(11)(C)(i) (2011), and that the crime "substantially jeopardized the safety and soundness of a financial institution, *see* USSG § B1.1(b)(15)(B)(i) (2011). As a result, with the concomitant offense-level increases, and in light of a granted three-level downward adjustment for acceptance of

responsibility, the district court sentenced Sims as a criminal-history-category I, level-28 offender to a prison term of 87 months, a sentence within the applicable Guidelines range of 78-97 months. Based upon the testimony of Michael Tregle, an attorney with the FDIC, the district court also ordered restitution to the FDIC in the amount of $2,424,000, the amount that the FDIC considered due and owing to it as the receiver of Oakland Deposit Bank's successor-in-interest.

On appeal, Sims first challenges the loss-amount figure calculated by the district court to establish the appropriate offense level and applicable Guidelines sentencing range. The district court determined the loss to the bank to be the $2,279,000 loan-principal amount attributable to Sims's machinations that the Oakland Deposit Bank was forced to write off as unrecoverable, but "allowing for credits, offsets, payments, realizations on collateral, whatever is there." The defendant contends, however, that the loss figure should be limited to only the $488,250 that Sims admits he obtained without the knowledge or acquiescence of the individuals whose names and other information were used on the loan applications.

We review a district court's sentencing determination for reasonableness under a deferential abuse-of-discretion standard. *United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). That review has both procedural and substantive components, the procedural aspect of which requires that we ensure that the sentencing court did not improperly calculate "the Guidelines range, treat[]

the Guidelines as mandatory, fail[] to consider the [18 U.S.C.] § 3553(a) factors, select[] a sentence based on clearly erroneous facts, or fail[] to adequately explain the chosen sentence . . . ." *Gall*, 552 U.S. at 51.

This first of Sims's challenges to his sentence alleges only procedural error – the improper calculation of a Guidelines range based upon the amount of loss suffered by the bank. He admits being responsible for $488,250 worth of loss, but insists that he cannot be held responsible for a loss between $1,000,000 and $2,500,000, as found by the district court. Although the defendant's malfeasance in forging loan applications in order to obtain $488,250 in loan proceeds is readily apparent, the fact is uncontroverted that Sims also procured construction loan proceeds in an amount over $800,000 and did not apply those funds to the uses for which they were provided. Instead, he appropriated the money for personal expenses and for business ventures totally separate from any plan to construct homes or rehabilitate residential property. The fraudulent procurement of those funds thus was properly considered in establishing Sims's Guidelines sentencing range.

The district court was justified in relying upon a loss figure of $2,279,000. Dana English, the FDIC field supervisor, testified that the agency's examinations of the Oakland Deposit Bank's records indicated that $2,279,000 of the bank's losses were attributable to Sims's actions. In light of that evidence, the district court did not abuse its discretion in adopting that figure and rejecting Sims's argument that he caused only $488,250 worth of damage to the financial institution.

Our conclusion on this first appellate issue preordains our resolution of the defendant's second allegation of error as well. Sims maintains before this court that the district court should not have applied a four-level increase to his offense level for "substantially jeopardiz[ing] the safety and soundness of a financial institution. *See* USSG § 2B1.1(b)(15)(B)(i) (2011). According to the defendant's argument, if he was responsible for a loss of only $488,250, that relatively small shortfall could not have caused the insolvency of the Oakland Deposit Bank. As we have held, however, the district court did not abuse its discretion in finding Sims responsible for a bank loss of over two million dollars, a loss that constituted 20 percent of all money lost by the bank, and an amount equal to the total earnings of the bank in the *three* years prior to the loss. This issue is patently without merit.

In a final issue, Sims disputes the $2,424,000 restitution amount included in the district court's judgment. The defendant's challenge to that figure fails, however, for two reasons. First, competent evidence before the district court established that "when this scheme ended," "the amount of principal [that was] outstanding on those loans and was written off by the bank as unrecoverable" amounted to "$2.424 million."

Second, defendant's counsel herself conceded that the government's assessment of the amount of restitution due and owing was correct. At the close of the testimony at the sentencing hearing, the district judge, assistant United States attorney Lawrence Laurenzi,

and defense attorney Doris Randle-Holt engaged in the following exchange regarding the

testimony of FDIC attorney Tregle:

> THE COURT: Anything you want to say about the testimony, Mr. Laurenzi?
>
> MR. LAURENZI: Your Honor, I think that the agreement of course was entered into as Mr. Tregle testified about clearly places any restitution to go to the FDIC. The FDIC has now stated what they consider that amount to be, and that should be the amount that is ordered by the court.
>
> THE COURT: All right. Ms. Holt?
>
> MS. HOLT: I submit it to the court, Your Honor.
>
> THE COURT: Do you have any reason to dispute that the FDIC is the appropriate recipient of the restitution?
>
> MS. HOLT: I have no reason to dispute it.
>
> THE COURT: What about the amount, do you have any issue with the amount of restitution?
>
> MS. HOLT: I believe that[ ] the amount we agreed on yesterday was 2.4 million.

Thus, if there was any error in the calculation of the restitution amount, it is clear that

Sims acquiesced to the figure offered by the government's witness. "[W]hen a party has

himself provoked the court to commit an error, that party may not complain of the error on

appeal unless that error would result in manifest injustice." *United States v. Demmler*, 655

F.3d 451, 458 (6th Cir.), *cert. denied*, 132 S.Ct. 794 (2011).

As discussed previously, the restitution figure offered during the testimony of the

FDIC lawyer had its basis in uncontroverted fact. The district court's reliance upon that

information was not error and clearly did not result in a manifest injustice. This issue, therefore, is also without merit.

For the reasons set out above, we conclude that the appellate record in this matter reveals no reversible error. Consequently, we AFFIRM the judgment of the district court.