NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0070n.06

Case No. 19-6427

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 03, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| RICHARD EUGENE DERRINGER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

BEFORE: ROGERS, DONALD, and BUSH, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** Richard Derringer was convicted of several child-pornography offenses stemming from his sexual assault of an eleven-year-old girl that his then-girlfriend recorded. He was sentenced to 100 years' imprisonment. Derringer challenges his convictions, the district court's denial of his request to substitute counsel during sentencing, and his sentence as procedurally and substantively unreasonable. Because those challenges fail to show error, or show only invited or harmless error, we affirm.

**I.**

In August 2019, Derringer was tried before a federal jury. Trial testimony established that in March 2018 he was supposed to chaperone, along with his then-girlfriend, Jacquolyn Walls-Land, at a children's sleepover birthday party. The victim, D.M., testified that the sleepover party was at a hotel. She was eleven years old at the time of the sleepover. During the night, D.M.

decided that she wanted to go home. Derringer said that he would drive her, but instead of taking her home, he stopped at a gas station then drove back to the hotel to pick up Walls-Land. They resumed the trip, but Derringer drove past the turn for D.M.'s home and eventually pulled onto a gravel road "in the middle of nowhere." Then, according to D.M.'s testimony, Derringer sexually assaulted her while she cried, trembled, and thought she "was going to die." At one point during the assault, D.M. looked back and saw Walls-Land holding her phone by the headrest of the passenger's seat pointed at them. D.M. wondered whether Walls-Land was recording but did not think that Derringer knew that Walls-Land was recording. After the assault, D.M. described Derringer smoking "little white crystals" in a clear pipe before having her do the same.

Walls-Land also testified. She explained that she took videos of the assault because Derringer asked her to do so, both in person and by text message. Walls-Land recounted past conversations in which Derringer had spoken "quite a bit" about wanting "to be" with a young girl. She testified that those conversations provided the context for her text message to Derringer that he did not have to take D.M. home, and which stated, "I just know how much you want her." A few messages after that one, Walls-Land told Deringer: "Take your time, have fun. It's not that hard to remember to push record this time," to which he responded, "10-4." A few messages later, Derringer asked Walls-Land whether she wanted to go with them. Although she messaged Derringer that she had "four other girls [in the hotel] logically probably not wise, you take her alone," Derringer told her to "come down," and then to "[g]et in and act cool." She replied, "Yes, sir," and then joined them in the car. She further described herself as the person recording the videos that were introduced at trial.

Walls-Land described the content of those videos as they played at trial. They showed Derringer sexually assaulting D.M in the driver's seat of the car. They also depicted several

interactions between Derringer and Walls-Land while she recorded from behind the passenger's seat with her phone positioned on the passenger's headrest, on the armrest, and "[r]ight next to" Derringer's hand. Those interactions included Derringer's handing a meth pipe to Walls-Land, instructing Walls-Land to move her phone from the headrest to the armrest for a better shot, and looking back at Walls-Land. Walls-Land testified that Derringer looked back at her after she had exited and reentered the van, telling her that "it appears that [D.M.] likes it in her butt more than her vagina, and to make sure that [Walls-Land] got that."

Walls-Land also testified that she did not attempt to send any of those videos from her Facebook Messenger account to Derringer's account and that Derringer was the only other person who could have attempted that. She testified that she specifically recalled him taking her phone the morning after the assault, that she left it on a table by the pool, and that she did not get it back until a few days later.[1] Other testimony established that the phone was found in a shed at Walls-Land's parents' house where Walls-Land and Derringer had been staying, that Derringer kept his property in the shed, that the keys to the shed were missing, and that those keys were returned a few days later by Derringer's mother.

Based on all of that information, the jury found Derringer guilty of four child-pornography offenses: conspiring to produce, producing, aiding and abetting another to produce, and possession. And it found him guilty of distributing methamphetamine. But it acquitted him of attempting to distribute child pornography.[2]

Several months after trial, Derringer filed a motion requesting new counsel, which the district court received the day prior to sentencing. It scheduled a hearing on the motion for the

---

[1] Walls-Land had two phones. She testified that she remained in possession of the phone she did not use to record the assault during the time when the other phone with the incriminating videos was missing.

[2] Walls-Land was also charged with crimes connected to the assault. She pleaded guilty to production of visual depictions of a minor engaging in sexually explicit conduct.

next day.  At that hearing, the court asked Derringer to explain his motion and why his counsel could not represent him at sentencing.  Derringer explained that he was dissatisfied at trial with his counsel advising him not to testify and stated: "He doesn't believe in my innocence.  He believes I should go to prison."  The court noted that his guilt was not an issue at sentencing and again asked why Derringer's counsel could not effectively represent him moving forward.  To that, Derringer stated: "I don't know how to tell you."  After continuing to discuss the issue with Derringer and his counsel, the district court denied the motion, finding that Derringer did not offer any cause for substituting counsel, that there was not a breakdown in communication, and that Derringer raised "the issue in an attempt to delay [the] proceedings."

The district court then continued to sentencing.  Over Derringer's objection, it applied a two-level Sentencing Guidelines increase for attempted distribution of child pornography, finding that Derringer did attempt to distribute by clear-and-convincing evidence even though the jury acquitted him of that charge.  Combined with the other enhancements, that resulted in an adjusted-offense level of 44 for each of the child-pornography offenses.  The court similarly determined that the methamphetamine-distribution offense resulted in an adjusted-offense level of 44 because it applied an enhanced-base-offense level of 38 for serious bodily injury before adding other enhancements.  The court then specifically asked the parties to address that offense.  The Government agreed with the court's calculation, stating that the serious-bodily-injury enhancement was appropriate.  Derringer's counsel responded: "I acknowledge what the Court has stated.  I have nothing to disagree with that. . . . But it appears to be -- the probation officer's recitation in the report appears to be correct."  Having noted the parties' comments, the district court found the total offense level to be 43, the maximum under the Guidelines.

That offense level, along with Derringer's criminal history category of six, resulted in a Guidelines sentence range of life imprisonment. But the statutory maximum for each offense made the Guidelines sentence 100 years. Derringer requested a total sentence of 30 years, and the Government a total of 50 years. The district court exceeded both requests. It found the nature and circumstances of the offense "horrendous" and found Derringer's history and characteristics favored a longer sentence. In fact, it had a "hard time finding any positive characteristics" in Derringer and determined that his expressed remorse was not heartfelt. The court then expressly considered the need to impose a sentence that would account for the seriousness of the offense, promote respect for the law, provide a just punishment, deter similar conduct, and protect the public from future crimes by Derringer, whom the court found to be a "continuing threat to the public." In considering those factors, the court determined that neither Derringer's nor the Government's requests were sufficient; instead, it imposed a Guidelines-length sentence with the counts running consecutively, producing a total term of 100 years' imprisonment.

## II.

Derringer challenges the sufficiency of the evidence for his child-pornography convictions, the district court's denial of his motion to substitute counsel, and his sentence as procedurally and substantively unreasonable. We consider each in turn.

### A. Sufficiency of the Evidence

We review de novo whether the evidence was sufficient. *United States v. Alebbini*, 979 F.3d 537, 543 (6th Cir. 2020). That review considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Maya*, 966 F.3d 493, 498 (6th Cir. 2020) (quoting *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016)). Here, Derringer

makes two sufficiency challenges: first, to the jury's finding that he acted "for the purpose of producing" a visual depiction of D.M. being sexually assaulted, as required under 18 U.S.C. § 2251(a); and second, to the finding that he possessed those visual depictions. Neither challenge has merit.

Viewing the evidence in the required light, there was more than enough to conclude that Derringer acted for the purposes of producing the videos of D.M. D.M. testified that she did not believe that Derringer knew Walls-Land was recording. But there was sufficient evidence for the jury to find otherwise. Walls-Land testified of past conversations with Derringer saying he wanted "to be" with young girls, and she suggested that Derringer "push record this time." The jury could have construed Derringer's response—his "10-4" and his telling Walls-Land to "come down," "[g]et in[,] and act cool"—was his directing her to come along for the purpose of recording the assaults on D.M. And the jury could have believed Walls-Land's testimony that she recorded the assaults at Derringer's request.

In addition, the videos themselves and Walls-Land's commentary on those videos support the finding that Derringer acted for the purpose of producing the recordings. The videos showed numerous interactions between Derringer and Walls-Land: handing a meth pipe to her, telling her where to hold the phone for a better shot, looking back at her, and making sure that she "got that"— that she recorded a specific part of the assault. And they were recorded by Walls-Land's phone positioned next to Derringer, at one point "[r]ight next to" his hand. The jury easily could have credited that evidence over D.M.'s speculation that Derringer did not know Walls-Land was recording. In sum, there was sufficient evidence for a reasonable jury to conclude that Derringer acted for the purpose of producing the videos.

There was also sufficient evidence for the jury to conclude that Derringer possessed those videos. Possession of child pornography may be actual or constructive and may be shown by direct or circumstantial evidence. *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009); *United States v. Richards*, 301 F. App'x 480, 483 (6th Cir. 2008). Here, viewing the evidence in the required light, the jury could have found either. It could have found credible Walls-Land's testimony that Derringer took her phone with the videos on it the morning after the assault when she left it on a table by the pool and did not see it again until it was retrieved from the shed a few days later. Derringer would then have had actual possession of the child pornography. Or it could have used other circumstantial evidence—that the phone was found locked in the shed where Derringer kept his property, that the keys to the shed were missing, and that those keys were returned a few days later from Derringer's mother—to conclude that he had constructive possession.[3] *Richards*, 301 F. App'x at 483 ("Constructive possession of an item can be the dominion over the premises where the item is located."). In short, the evidence was sufficient that Derringer possessed the videos.

## B. Motion to Substitute Counsel

Derringer also challenges the district court's denial of his motion to substitute counsel for his sentencing hearing. We review that denial for an abuse of discretion. *United States v. Marrero*, 651 F.3d 453, 464 (6th Cir. 2011). That review considers four factors: (1) the motion's timeliness, (2) the adequacy of the district court's inquiry into the motion, (3) whether the conflict with

---

[3] That the jury acquitted Derringer of the attempted-child-pornography-distribution charge does not change this conclusion. One can possess without distributing; here, the jury could have found the evidence insufficient to prove beyond a reasonable doubt that Derringer attempted to distribute the videos by sending them to his Facebook Messenger account, perhaps having a reasonable doubt that he had the phone at that specific time. But the jury still could have concluded beyond a reasonable doubt that he actually possessed the phone before placing it in the shed or that he constructively possessed it while it was in the shed. In any event, even if there is some tension in the jury's findings, a "jury *may* announce logically inconsistent verdicts in a criminal case." *United States v. Lawrence*, 555 F.3d 254, 261 (6th Cir. 2009) (quoting *United States v. Clemmer*, 918 F.2d 570, 573 (6th Cir. 1990)).

counsel prevented an adequate defense because it "resulted in a total lack of communication," and (4) considering the accused's right to counsel of choice against the public's interest in a "prompt and efficient" resolution. *Id.* A balance of those four factors fails to show an abuse of discretion.

First, Derringer's motion was untimely. Trial concluded in mid-August 2019; Derringer's motion was received by the district court in mid-December 2019, the day before the scheduled sentencing hearing. Even if Derringer submitted his motion in late-November, as it was dated, that was over three months after the conclusion of trial, during which Derringer's problems with his counsel arose, and only two weeks before the sentencing hearing. We have held similar timeframes untimely. *See, e.g.*, *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (finding a motion made two weeks before trial untimely); *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (finding a motion made a month and a half prior to trial untimely when the complained of conduct had occurred almost a year prior). Derringer provides no reason for the delay in making his motion. Therefore, this factor favors the district court's decision.

Second, the district court adequately inquired into Derringer's motion. It asked him repeatedly to explain his issues with counsel and attempted to determine how those issues impacted counsel's ability to represent him at sentencing. Derringer had every opportunity to explain his conflict. *See Marrero*, 651 F.3d at 465 ("[T]o meet this requirement, the district court simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it."). Therefore, this factor too favors the district court's decision.

Third, the conflict did not prevent an adequate defense by causing a total lack of communication. Derringer's chief complaints were that his counsel advised him not to testify at trial when he desired to do so and that his counsel did not believe in his innocence, thinking instead that he should go to prison. The district court found that those conflicts did not amount to a

breakdown in communication. That finding is not clearly erroneous. *See id.* at 466 ("[A] defendant's differences of opinions with his attorney do not create a complete breakdown of communication that compromises his defense."). Differences of opinion as to whether Derringer should have testified at trial were not relevant to the sentencing hearing. And, although the perceived correct level of punishment could, in theory, impact a counsel's ability to represent his client at sentencing, here, there was no suggestion of that possible effect. Believing Derringer to be guilty or that he should go to prison did not mean that counsel could not effectively argue for a favorable sentence. Nor was there an indication that attorney-client communication was affected by any differences of opinion on whether Derringer should go to prison and for how long.[4] This factor, therefore, also favors the district court's decision.

Finally, the fourth factor—balancing Derringer's request for counsel of his choice with the public's interest in a prompt and efficient resolution—was at most neutral. There had not been a long delay following trial and nothing indicates that Derringer caused any prior delays. But granting Derringer's request would have "necessitate[d] a last-minute continuance." *Vasquez*, 560 F.3d at 468 (quoting *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008)). And after conducting the inquiry into Derringer's request, hearing his reasons, and observing him in person, the district court found that Derringer raised "the issue in an attempt to delay [the] proceedings."

---

[4] Indeed, counsel's actions at the sentencing hearing support the district court's earlier determination. At that hearing, Derringer's counsel requested a sentence of 30 years instead of the 25 years Derringer asked him to request. He further requested that the counts not run consecutively so that 30 years would be total term. His strategy recognized the crimes' magnitude while arguing that 30 years accounted for that magnitude. Although that strategy was ultimately unsuccessful, nothing in the record indicates that counsel did not zealously attempt to secure Derringer a favorable sentence. Derringer points to counsel's noting, in that attempt, that where he and Derringer "have a big difference" is the federal sentences for child-pornography cases and stating: "You know, child porn basically is the murder of your senses. Your country cannot survive if you don't punish these offenders." But that statement was made in the context of trying to convince the district court to impose the 30-year sentence. It does not indicate that Derringer's counsel could not effectively represent him or that any differences in opinion resulted in an inability to communicate. Again, Derringer's counsel argued for a sentence 5 years greater than Derringer requested, 20 years less than the Government sought, and 70 years less than the court imposed.

Even if that was not the case, this factor is at most neutral. Accordingly, balancing the four factors shows that the district court did not abuse its discretion in denying Derringer's request.

## C. Procedural Reasonableness of the Sentence

Derringer next challenges the procedural reasonableness of his sentence. He advances two arguments: first, that the district court erred in applying the enhanced-base-offense level for the methamphetamine-distribution offense because that level applies only if "the offense of conviction" establishes that serious bodily injury resulted from using the substance. USSG § 2D1.1(a)(2). He contends that the jury never found that D.M. sustained serious bodily injury from using the methamphetamine, making the enhanced level inapplicable. Second, Derringer argues that the district court erred in applying a two-level Guidelines increase for attempted distribution of child pornography. He asserts that the court improperly applied that increase because the text of USSG § 2G2.1(b)(3) requires a defendant to "knowingly engage[] in distribution" and, as we held in *United States v. Havis*, the commentary cannot add offenses unsupported by the text. 927 F.3d 382, 386–87 (6th Cir. 2019) (en banc) (per curiam).

### 1. Enhanced-Base-Offense Level

Before reaching his first argument, we must determine whether Derringer invited the alleged error. An invited error is one that a party causes or influences the court to commit. *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993) ("The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." (quoting *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991))). It is part of the waiver doctrine. *Harvis*, 923 F.2d at 61. But, although waived arguments are typically unreviewable, we will consider invited errors when they "result in manifest injustice." *United States v. Demmler*, 655 F.3d 451, 458 (6th Cir. 2011). Such injustice

occurs when the government was as much at fault as the defendant for the error and the defendant claims that the error resulted in a constitutional-rights violation. *United States v. Howard*, 947 F.3d 936, 945 (6th Cir. 2020).

We have held an error to be invited in a variety of contexts, including sentencing under the wrong Guidelines' provision. In *United States v. Ruiz*, we held that a challenge to the application of a particular guideline was waived because the defendant agreed that it applied to him.[5] 777 F.3d 315, 321 (6th Cir. 2015); *accord United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) ("[A]n attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." (quoting *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990))). But, in *United States v. Mabee*, we found no waiver because the defendant did not agree that a specific enhancement applied. 765 F.3d 666, 672 (6th Cir. 2014). Although the defendant indicated a general belief that the presenting report was accurate, he did not note that belief as to the specific enhancement. *Id.* And the admissions he did make about that enhancement "did not demonstrate the sort of plain, positive concurrence with the district court's conclusions needed to establish a waiver or to invoke the principle of invited error." *Id.* Accordingly, if a defendant agrees with the application of a specific sentencing provision, then the defendant has invited any error as to application of that provision. That agreement can be expressed by various affirmative representations. *See United States v. Budd*, 496 F.3d 517, 529 (6th Cir. 2007) (holding that the defendant waived objection to a jury instruction when, after initially objecting, he later stated, "I'm getting more comfortable with it"); *United States v. Parker*, No. 19-3909, 2020 WL 6793333, *5 (6th Cir. Nov. 19, 2020) (holding that invited error precluded a claim when counsel stated that an action was "appropriate").

---

[5] *Ruiz* characterizes the action as waiver, but as noted, invited error is a subset of the waiver doctrine and the particular label here makes little difference.

Here, the district court asked the parties to address the court's calculation of the methamphetamine-distribution offense after specifically noting the enhanced-base-offense level for the serious-bodily-injury enhancement. The Government agreed with the calculation and that the enhancement was appropriate. Derringer's counsel then responded: "I acknowledge what the Court has stated. I have nothing to disagree with that. . . . But it appears to be -- the probation officer's recitation in the report appears to be correct." In addressing the specific enhancement of which he now complains, Derringer indicated his agreement. The statement that it "appears to be correct" is an affirmative indication of agreement, on par with counsel's saying he is "getting more comfortable" with something or saying that it is "appropriate." *Budd*, 496 F.3d at 529; *Parker*, 2020 WL 6793333, at *5. The invited-error doctrine therefore precludes Derringer's challenge to the enhanced-base-offense level unless the manifest-injustice exception applies.

That exception does not apply here because, though the Government was similarly at fault for the possible error by also endorsing it, Derringer only challenges it "as incorrect—not as a serious breach of his constitutional rights." *United States v. Nicholson*, 716 F. App'x 400, 418 (6th Cir. 2017); *see also Howard*, 947 F.3d at 945 (noting that the exception requires equal fault by the government *and* a constitutional-rights-violation assertion). Derringer therefore invited any error regarding the enhanced-base-offense level for the methamphetamine-distribution offense.

## 2. Two-Level Enhancement

Because Derringer invited any error as to that offense, his offense level for it was 44, which the district court dropped to 43 as the Guidelines' maximum. As a result, even if the district court erred regarding Derringer's other procedural-reasonableness challenge—that the Guidelines' commentary improperly added the offense of attempted distribution—his highest offense level was still 43. Because each offense involved the same victim and transaction, and therefore grouped,

43 would still have been the offense level applicable to the group even if the attempted-distribution enhancement to the child-pornography offenses was in error. *See* USSG §§ 3D1.2, 3D1.3(a). That makes any such error harmless. *United States v. Faulkner*, 926 F.3d 266, 275 (6th Cir. 2019) ("Errors that do not affect the ultimate Guidelines range or sentence imposed are harmless and do not require resentencing."). We therefore need not determine whether the district court did in fact err in applying the enhancement under USSG § 2G2.1(b)(3). Accordingly, the alleged errors affecting the procedural reasonableness of the sentence were invited or harmless.

**D. Substantive Reasonableness of the Sentence**

Lastly, Derringer challenges his sentence as substantively unreasonable. He notes that the district court sentenced him to the statutory maximum for each offense and ran those offenses consecutively, resulting in a sentence twice as long as the Government requested. At core, he argues that the sentence "is just too long."

We review whether a sentence is substantively reasonable for an abuse of discretion. *United States v. Fleischer*, 971 F.3d 559, 567 (6th Cir. 2020). In determining whether that abuse occurred, we consider why the district court found the sentence sufficient, but not greater than necessary, in accord with the 18 U.S.C. § 3553(a) factors. *Id.* at 572. A within-Guidelines sentence has a presumption of reasonableness. *Id.* at 567.

Here, Derringer's Guideline sentence was the statutory maximum of 100 years. *See* USSG § 5G1.1(a). The district court sentenced him to that maximum. In so doing, it discussed and applied the § 3553 factors, specifically noting how the sentence was necessary to reflect the seriousness of the offenses, promote respect for the law, provide a just punishment, deter similar conduct, and protect the public from future crimes by Derringer, whom the court found to be a "continuing threat to the public." It further considered its findings that Derringer's offenses were

horrendous, his history and characteristics favored a longer sentence, and his expressed remorse was not heartfelt. All of those factors led the court to conclude that neither the Government's nor Derringer's sentence recommendation was sufficient. Nothing indicates that the district court abused its discretion in reaching that conclusion, and Derringer points to nothing to overcome the within-Guidelines sentence's presumption of reasonableness.

To be sure, Derringer's sentence is long. But its length is consistent with the Guidelines. As we have noted before: "Congress, in conjunction with the Sentencing Commission, has decided to impose significant penalties for child pornography offenses." *Faulkner*, 926 F.3d at 274. The district court, after thoroughly considering the relevant factors, sentenced in accord with those significant penalties. "[W]e cannot say that his sentence is substantively unreasonable when considered against this framework." *Id*. Nor is it our role to substitute our judgment for that of the district court, even if we might have made a different call in its place. *See United States v. Christman*, 607 F.3d 1110, 1117 (6th Cir. 2010). Derringer's sentence therefore was substantively reasonable.

### III.

Accordingly, we affirm Derringer's convictions, the denial of his motion to substitute counsel, and his sentence.

ROGERS, Circuit Judge, concurring.  I concur with the judgment and join the majority except for parts II.C.1 and II.C.2.  In my view, it is clearer that Derringer's *Havis* argument fails than that an error was invited by Derringer's counsel with respect to the enhancement for the causing serious bodily injury.  Ruling on the *Havis* question avoids the need to address the invited error question.

A direct application of the language of the two-level Guideline enhancement for knowingly engaging in distribution shows that Derringer's conduct meets that definition.  Under U.S.S.G. § 2G2.1(b)(3), the court shall apply a two-level increase if the defendant "knowingly engaged in distribution."  To engage in conduct means "to do or take part in something."[1]  "Distribution" means the "act or process of distributing," that is, "giv[ing] out or deliver[ing] especially to members of a group."[2]  Here, there was evidence that Derringer attempted to send the files to himself through Facebook messenger from Ms. Wall-Land's phone.  The government introduced testimony indicating that because the videos were queued up, an attempt at delivery had been made; the videos were thus ready to send "pending . . . startup."  Derringer thus took part in the act or process of delivering the videos depicting the sexual assault.  Nothing about the definition of "engaging in distribution" requires that a single actor complete each and every step necessary to perfect the delivery.  It is enough that Derringer took meaningful steps in the distribution process.

---

[1] *Engage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/engage (last visited Feb. 3, 2021); *see also Engage*, Black's Law Dictionary (11th ed. 2019) ("To employ or involve oneself; to take part in; to embark on.").

[2] *Distribution*, Merriam-Webster, https://www.merriam-webster.com/dictionary/distribution (last visited Feb. 3, 2021); *Distributing*, Merriam-Webster, https://www.merriam-webster.com/dictionary/distributing (last visited Feb. 3, 2021).

This interpretation also accords with the Commentary, which defines "distribution" as "any act . . . related to the transfer of material involving the sexual exploitation of a minor."[3] U.S.S.G. § 2G2.1(b)(3), comment. (n.1). As the district court reasoned, this definition includes attempted distribution. Here, Derringer's conduct—possessing a phone with contraband and queuing up the videos to send on the phone's startup—easily falls under that definition.

Our decision in *United States v. Havis,* 927 F.3d 382, 386–87 (6th Cir. 2019) (en banc) (per curiam), does not undercut the district court's reliance on the Commentary in this case. In *Havis*, we held that where the Commission's Commentary adds to, rather than interprets, the Guidelines, the Commentary "deserves no deference" and the "text of [the Guideline] controls." *Id.* at 386–87. There, the enhancement involved a "controlled substance offense," which was already defined in the Guidelines submitted to Congress. *See* U.S.S.G. § 4B1.2; *Havis*, 927 F.3d at 385–86. The Commentary modified the existing definition of "controlled substance offense" by adding attempt offenses. *Id.* Here, in contrast, the Commentary simply clarifies what it means to "engage[] in distribution"—an undefined phrase that encompasses a broad range of conduct.

Since *Havis*, we have upheld Commentary definitions as authoritative where, as here, the Guidelines left a term undefined and the Commentary was consistent with the Guidelines. In *United States v. Buchanan*, for instance, we relied on the relevant application notes for U.S.S.G. § 4B1.3, which applies where a defendant's offense was "part of a pattern of criminal

---

[3] Application note 1 states:

> "*Distribution*" means any act, including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor. Accordingly, distribution includes posting material involving the sexual exploitation of a minor on a website for public viewing but does not include the mere solicitation of such material by a defendant.

U.S.S.G. § 2G2.1(b)(3), comment. (n.1).

conduct engaged in as a livelihood." 933 F.3d 501, 514 (6th Cir. 2019). We distinguished *Havis* as follows:

> [F]ederal courts are to treat commentary to a particular Guidelines provision as an authoritative interpretation of that provision as long as the interpretation "does not violate the Constitution or a federal statute" and is not "plainly erroneous or inconsistent with" the provision's text. . . . *Havis* stated that "commentary binds courts only 'if the guideline which the commentary interprets will bear the construction.'" *Havis*, 927 F.3d at 386. Because application note 2 to § 4B1.3 explains the meaning of "engaged in as a livelihood" in a way that the text of the Guidelines provision will bear, rather than adding to a list or definition given in the text of the Guidelines provision, the application note is binding on federal courts under [*Stinson v. United States*, 508 U.S. 36 (1993)] and *Havis*.

*Id.* at 514 n.2 (brackets and some internal citations omitted). More recently, in *United States v. Murphy*, 815 F. App'x 918, 924 (6th Cir. 2020), we applied the Commentary's definition of "intended loss," and in *United States v. De Leon*, 810 F. App'x 384, 385–86 (6th Cir. 2020), we upheld the Commentary's definition of "expunged." As in those cases, because the text of the enhancement will bear the Commentary's construction, the district court did not err in applying the enhancement.

This means that we need not address whether the district court's decision to apply the serious bodily injury enhancement was invited error. Even if the district court erred in that respect, Derringer's highest offense level is still 43. Because each offense involved the same victim and transaction and they are grouped together, 43 would still have been the applicable offense level even if the serious bodily injury enhancement was in error. *See* U.S.S.G. §§ 3D1.2, 3D1.3(a). That makes any such error harmless, along the lines of the majority's harmless error analysis. *See* maj. op. at 12–13.